1  Candice Clipner SBN (215379)
   Attorney at Law
2  1011 2ⁿᵈ Street, Suite 109
   Santa Rosa, CA 95404
3  Telephone: (707) 308-8399
   Email: candice@clipnerlaw.com
4
   Attorney for Plaintiff,
5  JONATHAN PORTNEY

6

7

8            **UNITED STATES FEDERAL DISTRICT**

9           **NORTHERN DISTRICT OF CALIFORNIA**

10                    **OAKLAND DIVISION**

11
   JONATHAN PORTNEY                    )  Case No.: 24-cv-07802-JSW
12                                     )
                                       )
13                                     )  **FIRST AMENDED COMPLAINT FOR**
                                       )  **DAMAGES**
14                                     )  1.   Race Discrimination, Title VII;
        Plaintiff,                     )  2.   Retaliation, Title VII;
15                                     )  3.   Retaliation in Violation of Cal. Lab. Code
                                       )       § 1102.5;
16  v.                                 )  4.   Retaliation for Exercising First
                                       )       Amendment Right to Free Speech, 42
17  COUNTY OF LAKE; and Does 1         )       U.S.C.§ 1983;
   through 5, INCLUSIVE,               )  5.   Retaliation, Monell Action, Based on
18                                     )       Policy and/or Failure to Train or Supervise,
                                       )       42 U.S.C.§ 1983;
19      Defendants.                    )  6.   Race Discrimination, - FEHA;
   _____    )  7.   Retaliation, - FEHA;
20                                        8.   Race Harassment - FEHA;
                                          9.   Failure to Prevent Discrimination,
21                                             Retaliation, Harassment - FEHA;
                                          10.  Retaliation for Taking & Requesting CFRA
22                                             Leave - FEHA;
                                          11.  Wrongful Termination in Violation of 14ᵗʰ
23                                             Amendment Right to Due Process, Monell
24                                             Action, 42 U.S.C. § 1983;
                                          12.  Wrongful Termination in Violation of 14ᵗʰ
25                                             Amendment Right to Property & Equal
26                                             Protection - Monell Action, 42 U.S.C. §
                                               1983
27                                        **JURY TRIAL DEMANDED**

28

---

FIRST AMENDED COMPLAINT FOR DAMAGES    Page -1-

Plaintiff Jonathan Portney (hereinafter "Mr. Portney"), alleges:

**INTRODUCTION**

1.     Defendant County of Lake retaliated and summarily terminated Mr. Portney's employment as the County of Lake's Health Services Director because Mr. Portney exercised his First Amendment right of free speech pertaining to matters of public concern, including: complaining about race discrimination and harassment, illegal conduct in the workplace, including but not limited to: the local Fire Chiefs affecting and attempting to affect, government business so they could get the contractor they wanted, to be awarded a government contract; Mr. Portney repeatedly telling the new Public Health Officer that an investigation into an unreported jail death needed to occur; the Board of Supervisors violating the Brown Act by having Board of Supervisors' Closed Sessions, labeled as Closed Session Public Employee Evaluations for Mr. Portney, when the BOS were in fact conducting government business behind closed doors. Mr. Portney is a Black man of mixed race, having a Black parent and a Caucasian parent. He is perceived as Black, including being perceived as a "light skinned" Black man.

2.     Mr. Portney alleges that Defendant County of Lake's (hereinafter "Defendant", "Defendant County", "the County" or "Defendant County of Lake") managing agents retaliated against him for engaging in protected activity, including but not limited to, expressing his First Amendment Right of Free Speech and the Right to Petition the Government. Defendant treated Mr. Portney differently based on his race and was retaliated against for requiring compliance with state and federal laws, and opposing violations of illegal activity in the workplace, including but not limited to, race discrimination.

3.     Federal and State Laws protect an employee who complains about unlawful

employment practices in the workplace. The 1964 Civil Rights Act, as amended, Title VII, and the California Fair Employment and Housing Act ("FEHA") prohibits discriminating against an employee because of the employee's race, sex, gender, perceived sexual orientation, and other protected classifications. (Gov. Code § 12940, subd. (a).) The FEHA further provides in Government Code section 12940, subdivision (h) that it is unlawful for an employer to discharge or otherwise discriminate against a person "because the person has opposed any practices forbidden under [FEHA]." The California Supreme Court has instructed that Government Code section 12940, subdivision (h) therefore "forbids employers from retaliating against employees who have acted to protect the rights afforded by the [FEHA]." ( *Yanowitz v. L'Oreal USA, Inc.* (2005) 36 Cal.4th 1028, 1035).

## JURISDICTION

4.      Federal question, subject matter jurisdiction exits as Mr. Portney brings this action pursuant to Title VII of the 1964 Civil Rights Act, as amended, and 42 U.S.C. §1983, as well as pursuant to the laws of the State of California, the California Fair Employment and Housing Act. This court has jurisdiction over the subject matter pursuant to 28 U.S.C. §1331, which provides that "[t]he district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States. 28 U.S.C.A. § 1331.

## DIVISIONAL ASSIGNMENT

5.      Assignment of this action was initially to the Eureka Division of this Court, pursuant to L.R. 3-2(f), because the events giving rise to this action occurred in Lake County, California. Pursuant to Civil L.R. 3-2(g), all cases assigned to the Eureka division will be assigned to a Magistrate Judge presiding in that division. Such assignments are

subject to Civil L.R. 73, and require the consent of the parties. Any case for which all parties do not consent will be reassigned to a District Judge in San Francisco, Oakland, or San Jose division.

6.      On November 7, 2024, this action was filed. On November 14, 2024, Plaintiff filed a Consent/Declination to Magistrate Judge Jurisdiction, declining magistrate jurisdiction [ECF 6]. On November 19, 2024, this action was reassigned to Judge Jeffrey S. White [ECF 9].

**PARTIES**

7.      Plaintiff Mr. Portney, is a citizen of the United States of America and during the time he was employed by Defendant County, was a resident of Lakeport, in Lake County, CA. At all times herein relevant, Mr. Portney was an employee of the County of Lake, in the position of Health Services Director, until his wrongful termination on September 12, 2023.

8.      Defendant County of Lake is Mr. Portney's former employer, and a public entity that regularly employs more than 15 persons.

9.      Defendant County of Lake is a "general law" county which adheres to state law as to the number, and duties, of county elected officials. The California Constitution authorizes County of Lake to make and enforce local ordinances that do not conflict with general laws. Additional powers are granted to counties by the Legislature. The powers of a county can only be exercised by the Board of Supervisors or through officers acting under the authority of the Board or authority conferred by law. In addition, the Board must follow the procedural requirements in the statutes or its actions will not be valid. If the Legislature has provided a method by which Lake county may do something, that method must be

followed. Where the law does not specifically prescribe a method for accomplishing a task, the County may adopt any reasonably suitable means. Defendant County of Lake was and is, also responsible for complying with the laws and regulations of the United States.

## RESPONDEAT SUPERIOR

10.     All of the described conduct, acts, and failures to act are attributed to agents and managing agents of Defendant County of Lake. Said acts, conduct and failures to act were within the scope of such agency and employment. At all times relevant herein, each participant was acting within the course and scope of his or her employment and agency. Further, at all relevant times each Defendant was acting in agreement, and with the endorsement, ratification and consent of each of the other Defendants.

## RATIFICATION

11.     Defendant County of Lake and its managing agents, in both their individual and official capacities, ratified, adopted, and authorized each of the Defendants, employees, agents, and managing agents' illegal conduct. Defendant County of Lake and its managing agents knew or should have known, that its agents and managing agents were engaging in illegal conduct and had been warned, informed, and given prior notice of the illegal conducts.

12.     When an employer ratifies the tortious conduct of an employee, the employer becomes "liable for the employee's wrongful conduct as a joint participant." *Fretland v. County of Humboldt* (1999) 69 Cal. App. 4th 1478, 1489-1490. An employer who fails to discipline an employee after being informed of that employee's improper conduct can be deemed to have ratified that conduct. *Hart v. National Mortgage & land Co.* (1987) 189 Cal. App. 3d 1420, 1430; *Iverson v. Atlas Pacific Engineering* (1983) 143 Cal. App. 3d 219, 228.

According to the court in *Iverson*, supra, if an employer is informed that an employee has committed an intentional tort and nevertheless declines to "censure, criticize, suspend, or discharge" that employee, a claim can be made for ratification. *Id.*

13.    "Ratification is the voluntary election by a person to adopt in some manner as his own, an act which was purportedly done on his behalf by another person, the effect of which, as to some or all persons, is to treat the act as if originally authorized by him. A purported agent's act may be adopted expressly or it may be adopted by implication based on conduct of the purported principal from which an intention to consent to or adopt the act may be fairly inferred, including conduct which is 'inconsistent with any reasonable intention on his part, other than that he intended approving and adopting it.'" *Fretland*, supra 69 Cal. App. 4th 1491.

14.    At all relevant times alleged herein, Defendant County of Lake and its managing agents and/or employees, in both their individual and official capacities, had actual and constructive knowledge of managing agents and/or employees illegal conduct and have endorsed, ratified, and encouraged managing agents and/or employees' illegal behavior. Defendant County and its managing agents and/or employees, in both their individual and official capacities, failed to take corrective action to protect Mr. Portney and the public from managing agents and/or employees' illegal behavior, which has been ongoing for years.

## EXHAUSTION OF ADMINISTRATIVE REMEDIES

15.    Mr. Portney exhausted his administrative remedies by filing charges of discrimination with appropriate federal and state agencies, obtaining right to sue letters, and by complying with the Government Code.  On March 8, 2024, Mr. Portney submitted his

Tort Claim and it was Received by Defendant County of Lake (Defendant County's form is specifically titled, "Claim for Damages Against the County of Lake", but hereinafter referred to as "Tort Claim") against Defendant County of Lake. The Tort Claim was stamped "Received Mar 8 2024 County of Lake Board of Supervisors/Administrative Office" by the Clerk of the Board. In handwriting, the clerk with Defendant County noted the time of 2:09 p.m., and "County Counsel/DHS" as Department involved. Mr. Portney likewise has a proof of service pertaining to the personal service of the Tort Claim to the Clerk of the Board for Defendant County on March 8, 2024. The address for Mr. Portney's counsel on Mr. Portney's Tort Claim, was listed as 740 4th Street, Santa Rosa, CA 95404.

16.    Defendant County failed to send proper or timely written notice of rejection to Mr. Portney or his counsel, within 45 days of receiving the claim, thus Mr. Portney has two years from the accrual of the cause of action to file suit. Cal. Govt. Code §§ 911.6(a), 912.6, 945.6(a)(2); Code § 913, § 915.2.

17.    Neither Mr. Portney nor his counsel were ever personally served with a rejection letter, and a letter was never mailed to Mr. Portney's counsel's address as listed on Mr. Portney's Tort Claim (the address listed on Mr. Portney's Tort Claim was):

> Candice Clipner
> 740 4th Street
> Santa Rosa, CA 95404

18.    On May 9, 2024, Mr. Portney filed his complaint with the Equal Employment Opportunity Commission ("EEOC") and asked for an immediate Right to Sue. On August 9, 2024, the U.S. Department of Justice, Civil Rights Division ("DOJ"), issued Mr. Portney a Federal Notice of Right to Sue letter, which Mr. Portney received on August 9, 2024. The

DOJ also served the County with the Federal Notice of Right to Sue Notice letter to HR@Lakecountyca.gov and to Supervisor Sabatier and previously emailed Mr. Portney's EEOC complaint to Defendant County. On November 5, 2024, the County of Lake was also personally served with the Federal Notice of Right to Sue letter. Mr. Portney has timely filed his federal civil rights claims.

19.     On September 26, 2024, Mr. Portney filed his complaint with the Department of Fair Employment and Housing ("DFEH") and asked for an immediate Right to Sue. On September 26, 2024, the DFEH issued Mr. Portney a Right to Sue letter. On November 5, 2024, Defendant County was personally served with Mr. Portney's Complaint of Discrimination filed with the Civil Rights Department ("CRD") pursuant to the California Fair Employment and Housing Act, and Mr. Portney's Right to Sue Notice from the CRD.

## WORKERS' COMPENSATION EXCLUSIVITY DOES NOT APPLY

20.     Each and every wrongful, injurious, intentional, willful, discriminatory, harassing act, and failure to act, by DEFENDANTS were not normal incidents of employment and were outside the scope of the employment bargain. Thus, Workers Compensation exclusive remedy set forth in California Labor Code §3600 et seq. will not preempt, nor bar Plaintiff's right to recover for damages set forth herein.

## STATEMENT OF FACTS

21.     On November 30, 2021, the Board of Supervisors for the County of Lake announced that Mr. Portney was the County of Lake's new Health Services Director effective January 10, 2022. Mr. Portney was living in San Francisco with his wife when he received his offer of employment, and relocated within a few weeks to Lakeport, CA.

22.     The Health Services Director position oversees all of the Health Services

functions for the County. On November 30, 2021, the County announced, "We are very excited to partner with Jonathan Portney to further our efforts to fight COVID-19, and promote the health and well-being of every Lake County resident[.]"

23.    In January 2022, when Mr. Portney and his wife first came to Lake County after his hiring, they witnessed what appeared to be a Confederate rally, with what appeared to be hundreds of people with Confederate flags. Mr. Portney asked Ms. Hutchinson if he and his wife were safe in Lake County and said he did not feel safe. Ms. Hutchinson said he was, and suggested he talk to Supervisor Tina Scott.

24.    On or around January 11, 2022, Mr. Portney was appointed as the County of Lake's Health Services Director. The Health Services Director position is an elected official and department head, position.

25.    Mr. Portney's direct supervisors were the Board of Supervisors. The County's County Administrative Officers ("CAO") were Carol Hutchinson first, then Susan Parker, who acted as the intermediaries between the BOS and Mr. Portney.

26.    On or around March 18, 2022, Ms. Hutchinson announced that she would be retiring with her last day being April 29, 2022.

27.    In or around April 2022, Mr. Portney spoke with Ms. Huchinson about the racial tension he felt from Lake County staff. Certain Health Department employees would repeatedly not provide him with complete or accurate information he requested, they were dismissive of Mr. Portney, he would get a sigh when he asked questions or for information, or was told, "We don't do that here." Mr. Portney would most often receive a stiff "Hello" or no response to, "Hello" from several of the Health Department's employees. Mr. Portney told Ms. Hutchinson that he had already learned that Black employees and contractors did

1    not last in Lake County.

2        28.    Mr. Portney told Ms. Huchinson that Eileen Van Cleave, Director of Nursing

3    (in Mr. Portney's department) who is a racial minority, that she had warned him that he

4    would face hardship due to prevalent bullying and harassment, and that she was being

5    harassed by Jennifer Baker. Mr. Portney told Ms. Hutchinson that he feared for his safety

6    as a Black man in this environment. Ms. Hutchinson told Mr. Portney to not worry, and that

7    she was relatively safe despite being a lesbian in Lake County, even though there was a

8    protest at her home. Ms. Hutchinson recommended that he talk with Supervisor Scott.

9        29.    About a week or two after talking with CAO Hutchinson, she arranged a

10   Zoom conference between Supervisor Scott and Mr. Portney. Mr. Portney told Supervisor

11   Scott that being a Black man, seeing Confederate flags, and racial tension with employees,

12   that he did not feel safe. Supervisor Scott said she heard his concerns. She said her husband

13   is Black and that their children have experienced name-calling and that she and her husband

14   have had to stand up for their kids when it comes to racism at school. Supervisor Scott told

15   Mr. Portney to talk with Fire Chief Jeffrey Thomas who was the newly appointed, and first

16   and only Black fire chief in Lake County's history.

17       30.    In or around April 2022, Mr. Portney reached out to Fire Chief Jeffrey Thomas

18   about the racial tensions he was experiencing. Mr. Portney said he was not feeling

19   comfortable and felt like he was walking on eggshells working with the other Fire Chiefs.

20   Mr. Portney explained that the other Fire Chiefs were not showing up for meetings that he

21   facilitated but they do for others. Mr. Portney said they are not following the policies and

22   procedures that he is required to have them follow.  Fire Chief Thomas agreed and said that

23   he has mentioned policies and procedures violations with the other Fire Chiefs, and

attempted to correct them, but they dismissed his concerns and proposals for correction. Fire Chief Thomas told Mr. Portney that people like us are not welcome or wanted here, especially in leadership. He told Mr. Portney that he thought Mr. Portney's race had something to do with his problems with the Fire Chiefs and that he thought the same thing for his problems with the Fire Chiefs. Chief Thomas told Mr. Portney that he planned to resign in May due to similar problems, and the Fire Chiefs' unwillingness to address the concerns Chief Thomas was raising.

31.    On April 12, 2022, County Administrative Officer ("CAO") Susan Parker was appointed Interim CAO.

32.    On or around April 14, 2022, Supervisor Scott announced her early resignation from the Board of Supervisors, and that her resignation would be effective July 31, 2022.

33.    In or around May 2022, Lynn Brookes (Community Health Nurse) came to Portney's office and mockingly said she had a gift for Portney. Upon sitting down, she offered Portney a wooden whistle and placed it on his desk. Brookes said it was for his safety. Brookes explained that she and Deputy Health Services Director, Jennifer Baker, had discussed safety concerns Portney should have. Brookes mockingly told Portney he could use the whistle if he were "under attack" and said, "and maybe someone will come and help." Brookes further told and demonstrated to Portney how to use the whistle. "You blow once," and blew the whistle, "you blow twice" and blew the whistle a second time. Brookes then told Portney that the Fire Department Chiefs were unhappy with him, pointed to her skin on her forearm (which is white) and said, "People who are different struggle here." After, Lynn Brookes asked Portney if he used the whistle she gave him and then laughed. Brookes also mockingly told Portney to keep the whistle nearby.

34.     In Mr. Portney's capacity as Health Services Director, he was overseeing a Request for Proposal (RFP) previously issued by Carol Hutchinson, who was the Interim Health Services Director before Mr. Portney was appointed (as well as the CAO). The RFP was regarding the County's Inter-Facility Transfer ("IFT") Ambulance Services and Local Emergency Medical Services System.

35.     The RFP was to remedy the inadequate IFT services to meet local needs, as it was not uncommon for no IFT transports to be available on some days, even though the County had two, 25-bed critical care hospitals. Oversight of the IFTs was the responsibility of the Local Emergency Medical Services Authority ("LEMSA"). The County's LEMSA contractor, North Coast EMS ("NCEMS"), had not provided solutions. Therefore, the County sought bids for its IFT RFP.

36.     On May 19, 2022, an award letter was sent to all proposers advising that Marsh EMS Consultants' proposal was selected.

37.     Before it was publicly announced that Marsh was selected, on or between May 19th - May 24th, 2022, Fire Chiefs Mike Ciancio, Willie Sapeta, and Paul Duncan contacted Mr. Portney by email protesting Marsh EMS Consultants being selected, and identified AP Triton as the candidate that should have won. Mr. Portney responded that there was a panel of five that decided the outcome of the bid (The fact that the Fire Chiefs were contacting Mr. Portney indicated to him that his Deputy Director, Jennifer Baker, leaked this confidential information to the Fire Chiefs as she was the only person in the Health Department who had access to this information and Ms. Baker was very supportive of the Fire Departments' interests).

38.     On May 23, 2022, Ms. Parker was appointed permanent CAO.

39.     On May 24, 2022, AP Triton emailed the Board of Supervisors its Letter of Appeal regarding not being selected, and several layers of hearsay in support of its position that Marsh EMS Consultants should not have been selected.

40.     In or around May/June 2022, Mr. Portney told his Deputy Director, Jennifer Baker, that he was trying to establish a relationship with the fire departments and they were ignoring him. He was discussing policy violations from the Fire Department and LEMSA, when Ms. Baker's eyes got wide and said, "Walk the line or something bad could happen to you."

41.     On or around June 7, 2022, Mr. Portney had a Closed Session Employee Evaluation with the Board of Supervisors, CAO Parker, and Annita Grant. Supervisor Pyska asked Mr. Portney about the Letter of Appeal by AP Triton. Mr. Portney told the BOS that in addition to the Letter of Appeal, Fire Chiefs Ciancio, Duncan, and Septea were interfering with the RFP process by engaging with his Deputy Director Baker, to seek information on the RFP outcome prior to BOS presentation & review.

42.     Mr. Portney also told the BOS that Fire Chiefs had sent emails to Mr. Portney after the Intent to Award was sent to Mike Marsh, and the four other companies that placed bids, inquiring about Marsh's qualifications compared to AP Triton, and why AP Triton was not selected.  The Fire Chiefs stated that they believed AP Triton was more capable to do the work than Mike Marsh Consulting. Mr. Portney informed the BOS during this closed session meeting, that he felt the Fire Departments were attempting to interfere and influence the RFP process because they wanted AP Triton to get the award.

43.     CAO Parker said that based on what AP Triton shared, she thought it was a good idea to do the RFP process over again. Mr. Portney objected, stating that the BOS had not even had the opportunity to review Marsh EMS Consultants' proposal, and that the winning proposal is what a group of 5 panelists decided was best for the County for the scope of work needed in

the RFP.

44.     Mr. Portney told the BOS that Fire Chiefs Ciancio, Duncan, Sepeta, and AP Triton, did not want Marsh EMS Consulting to receive this award because the Fire Chiefs and AP Triton knew that Marsh EMS Consulting was pushing to revamp the ambulance system because it was not compliant with the Lake County EMS Ordinance No. 2687, nor Ambulance Operation Standards (Sec.83.2), Non-Emergency Services Operations (Sec. 83.3). Mr. Portney also told the Board of Supervisors that AP Triton had a conflict of interest as they were creating a strategic plan to dismantle the 1970s EMS Act which would stop private ambulances from being able to co-operate with Fire Districts Operational areas, which would push out private ambulances and giving the Fire Department full control.

45.     In response, Supervisor Pyska told Mr. Portney that CAO Parker was right, and that the RFP should be conducted again (this is in closed session, without verifying any of AP Triton's claims against Marsh Consulting). Mr. Portney asked why, and on what grounds. Supervisor Pyska told Mr. Portney that it seemed like there was tension with the outcome of the winning candidate, in the view of the Fire Department, and that maybe the Fire Departments should have a say in the process. Mr. Portney told Supervisor Pyska that just because there is tension, that should not mean the County should not select the winning candidate and that he believed a conflict of interest existed in the Fire Departments' desire to have AP Triton win the contract. Mr. Portney told Supervisor Pyska that the Health Department is trying to fix the problems that the Fire Departments have created. Having the Fire Departments determine how the Health Department operates and when the Fire Departments are currently not meeting standards did not seem appropriate. CAO Parker interjected that she would work with Mr.

Portney to do the RFP process over again. Mr. Portney said that this was inappropriate. CAO Parker told Mr. Portney to inform Marsh EMS Consulting that he would no longer be considered for the award, and to retract the offer. Mr. Portney asked if the Board would at least consider looking at the Marsh EMS proposal for consideration, to which Supervisor Pyska responded, "No."

46.     Mr. Portney told the Board of Supervisors that the Fire Departments' interference was inappropriate as they were attempting to influence government business and operations. Mr. Portney told the BOS that he needed a candidate like Marsh Consulting to hold the Fire EMS accountable for their inability to provide services to meet the community's and hospitals' needs for the County's patients. He also told the BOS that he had asked the Fire Department several times for records pertaining to response times & transport times to no avail.

47.     County Counsel Grant said that she would  try to help Mr. Portney get access to this information through a [public records] request. Counsel Grant also said that accessing this information through a request was going to be challenging because the Fire Departments is not organized and was lacking in many regards. Upon conclusion of this Closed Session Meeting & Evaluation, CAO Parker said she would contact Mr. Portney about redoing the RFP.

48.     On June 20, 2022, Mr. Portney issued a cancellation of the RFP as directed by the BOS. Despite that it was never discussed in open session with the public.

49.     In or around late June 2022, Public Health Officer, Eric McLaughlin, M.D., informed Ms. Baker, in Mr. Portney's presence, about the importance of confidentiality and how she was not to share internal health department information with external partners.

50.     In or around July 2022, Mr. Portney told Ms. Baker that Staff Service Analyst,

Kelly Hanlon, would be supporting him instead of Ms. Baker, in the second RFP process.

51.    In or around July of 2022, a former Emergency Management Services contractor for Lake County who is also Black, informed Mr. Portney that he was pushed out by the Fire Department due to their adversarial relationship and lack of support. The contractor warned Mr. Portney to be cautious in his dealings with the Fire Departments and the Board of Supervisors, whom the contractor described as advocates for the Fire Departments, and said the BOS engage in shady dealings in their operations.

52.    In or around August 2022, Crystal Markytan, Director of Social Services, wrote an email to Mr. Portney to "get in line" after he told her that his department could not have one of the nurses from his department working in her department, because the County of Lake did not have a Public Health Officer (PHO McLaughlin, M.D., had resigned in June 2022). Mr. Portney called Ms. Markytan for an explanation as to her email regarding "get[ting] in line." Ms. Markytan told him that, "People like you" in this county had to fall in line. Mr. Portney asked if she was threatening him. She said to label it as advice. Mr. Portney took her "People like you" comment as racist because he is Black and she is Caucasian.

53.    Plaintiff is informed and believes and alleges, that on or around August 12, 2022, Deputy Director for Health Services, Jennifer Baker, informed staff at a satellite location, that she and Health Programs Coordinator, Amanda Frazell, were going to frivolously manufacture a letter of "No Confidence" against Mr. Portney and that the letter of no confidence was sponsored by the Fire Chiefs.

54.    Plaintiff is informed and believes and alleges that Ms. Baker was rallying the staff against Mr. Portney and belittling him to Health Staff. Lynn Brooks (Community Health Nurse, Senior) and others were also disparaging Mr. Portney amongst Health Services staff and

influential members of the public and at clinics. Ms. Brookes would go out of her way to disparage Mr. Portney at clinics. Mr. Coddington complained to Human Resources, Ms. Samac, about Ms. Brookes, but Ms. Brookes was thereafter promoted.

SECOND RFP

55.    On August 29, 2022, the second RFP was announced, with proposals to be submitted by September 13, 2022. The County received bids from 5 businesses, including Marsh Consulting and AP Triton.

56.    On November 7, 2022, Fire Chief Mike Ciancio emailed Mr. Portney and others (included BOS members) that he wanted copies of the RFP proposals and all of the score sheets. Mr. Portney replied to all, that it was confidential information and that he would not be provided that information.

57.    On November 8, 2022, the panelists selected End Point Consulting. Mr. Portney emailed all proposers that End Point Consulting was chosen.

58.    In early November, 2022, Mr. Portney's son was born.

59.    On November 14, 2022, Fire Chief Mike Ciancio emailed Mr. Portney and Supervisor Sabatier, Supervisor Crandall, Counsel Grant, CAO Parker, Fire Chief Willie Sapeta, Fire Chief Huggins, and Fire Chief Patrick Reitz, and Fire Chief Paul Duncan, with the following subject, "Protest of the EMS RFP".

Mr. Portney,

7 days ago I requested copies of the RFP proposals and all of the score sheets. At this time ( Nov 14th 4:55 pm ) I have yet to receive them. I understand that by policy or law you have ten days to get any records requested back to the requestee. With the appeal process only 7 days there is definitely reason to wonder why. I have to question your motives and any lack of transparency.  I am formally appealing the process you used in regards to this RFP and will be attending the BOS mtg. to state my

concerns with awarding a contract to a company when we can not even determine whether there was something to protest.
*Mike Ciancio , Fire Chief*

*Northshore Fire Protection District*

60.    Mr. Portney replied to all that a letter of intent to award was pending, and that an RFP proposer had a right to rebut the decision by sending a formal letter of appeal (Chief Ciancio, however, was not an RFP proposer). Mr. Portney noted, "It becomes difficult when insider knowledge is shared  hindering the integrity of the process."

61.    On November 16, 2022, a staff member congratulated Mr. Portney on the birth of his son and that person asked to see a photo of his son. Liberty Francis (Tobacco Program Manager) was also present and when he showed the photo, Ms. Francis looked and said, "Oh."

62.    On or around December 5, 2022, Ms. Hanlon placed an agenda item for the BOS on the County's website, listing RFP, Successful Proposal and Approval from county counsel.

63.    On or around December 5, 2022, nine health services staff employees (whom Portney did not directly supervise) purportedly electronically signed (although dates of signatures were not indicated) a letter "as our official [even though there is no such official document] notice regarding a Vote of No Confidence ("VONC") in County of Lake Health Services Director Jonathan Portney." Even though the letter was purportedly signed by the 9 staff employees, **Fire Chief, Paul Duncan, who is not an employee of the County, was the first author of this document** and instigated this so this his preferred contractor, AP Triton would get the contract.

64.    Fire Chief Duncan facilitated the VONC against Mr. Portney in coordination with his staff to eliminate the possibility of an audit of the Fire Department as well as policy or contractual changes with the LEMSA or the EMS agency that Mr. Portney was pursuing in the

interest of public safety and adherence to health and safety codes. Chief Duncan wanted to remove Mr. Portney to ensure that AP Triton would receive the 2nd RFP award, as AP Triton's proposals aligned with the Fire Department's operational goals and would protect their control over EMS policies. Mr. Portney believes that Chief Duncan's efforts were further influenced by racial bias against him.

65.     On December 6, 2022, at 8:35 a.m., **Paul Duncan** (asst. Fire Chief at South Lake County Volunteer Firefighters Association, Division Chief, Operations Cal Fire North Division operations chief) **via Docusign, emailed Supervisor Mike Green, the VONC Letter.** At 9:01, Supervisor Green forwarded the email to Mr. Portney. Not by happenstance, Mr. Portney had a 9:00 a.m. Zoom meeting with the BOS. Mr. Portney also had an evaluation with the BOS scheduled for December 6, 2022, but this meeting was cut short due to the VONC letter Fire Chief Duncan emailed to Supervisor Green. The evaluation was rescheduled to December 13, 2022. At 10:37 a.m., Mr. Portney emailed Supervisor Green and Ms. Samac, that he would respond to these concerns/allegations submitted by Chief Duncan and certain Health Department staff. Mr. Portney emailed that the accusations were not true, that he could prove it (however, he did put an email in the thread of another email the termination of Jennifer Baker and the employee promotion in the same email was because Susan Parker, told him to do it).

66.     Mr. Portney's evaluation meeting was rescheduled to on or about December 13, 2022.

67.     On or around December 6, 2022, Ms. Samac was informed by Mr. Dwight Coddington, amongst other things, that there was a collaborative effort to undermine Mr. Portney that he was a witness to. Ms. Samac ended the meeting by asserting that his complaint sounded as if he planned on suing to which Mr. Coddington replied, we "simply want to see changes." Mr. Coddington is a witness to racist comments made by others against Portney.

68.     After December 6, 2022, in or around the month of December, Kelly Hanlon,

told Mr. Portney that Liberty Francis[1] said she saw a photo of Mr. Portney's son and said, "It's unfortunate it's mixed, it will have that hair texture, you know?"

69.    In or around December 7-10, Mr. Portney met with Anita Grant and Pam Samac at County Counsel's office in the book room. Mr. Portney told them that Ms. Baker was coordinating with his staff to cause chaos and tension in his department and he felt he was being harassed by multiple staff. Ms. Grant said they would contract an independent investigator, Oppenheimer, and launch an investigation. Mr. Portney said that this was turning into an unworkable hostile environment.

70.    On December 8, 2022, Matthew Rothstein (Public Information Officer) told Mr. Portney he just provided the VONC letter to Lake County News, Elizabeth Larsen. Mr. Portney asked why he would do that when complaints are supposed to be investigated before being released. He told Mr. Portney he would need to talk to Susan Parker. Mr. Portney called CAO Parker and asked her the same thing. She told him to "get ahead" of what the press would write, and told him to email all of his staff about the VONC.

**Mr. Portney's December 13, 2022 Employee Evaluation Meeting**

71.    On December 13, 2022, Mr. Portney's Employee Evaluation meeting took place (previously scheduled for December 6). Mr. Portney brought a 12 page rebuttal document to the VONC letter. The BOS were present as well as CAO Parker and Anita Grant. Mr. Portney said he had evidence to rebut the VONC letter and had a rebuttal letter and exhibits. Ms. Parker said, "You can give those to me." She walked over to Mr. Portney and said, "I'll take that." And picked up the documents. Mr. Portney said he was really disappointed with what was going on with the VONC and said he feels like he is being harassed. **Supervisor Simon aggressively said in response, "So what do you want us to do about it?"** Mr. Portney put his head down. After some silence, Ms. Grant said, they would investigate, that they have great investigators that they work with and they will be reaching out. Mr. Portney did say he wanted an investigation.

---

[1] Liberty Francis also goes by "Liberty Perry".

72.    Also on December 13, 2022, Mr. Portney reported to the BOS that he felt like he was being harassed because of his race and that he did not feel safe. **Supervisor Green** said in response to Mr. Portney, "**If you hear banjos coming your way or see hooded men coming over the hill, be sure to let us know**."

73.    Supervisor Green's comment was racist in and of itself and thus hostile toward Mr. Portney. Supervisor Simon's aggressive comment clearly showed that the BOS did not want to be bothered by Mr. Portney's complaints or Mr. Portney's fears for his safety.

74.    During the December 13, 2022 meeting, Mr. Portney not only complained of race harassment orally, but also in writing. Mr. Portney's 12 page written rebuttal to the "No Confidence" letter said, "Defamation, Ageism, Racism, Whistleblower Retaliation Harassment, & County Policy Violation on every page, and Mr. Portney had several exhibits with his rebuttal letter that CAO Parker took. Mr. Portney verbally rebutted all of the points in the VONC letter.

75.    On December 16, 2022, during a phone call with Fire Captain, Jim Dowdy, after Mr. Portney was explaining the required process to run the Emergency Medical Care Committee (EMCC), and after Mr. Portney objected to the fire department's plan to create their own policies and procedures regarding how fire department operates (the intent to bypass the EMS authority (the Board of Supervisors and Mr. Portney, as the appointed Health Services Director), Mr. Dowdy then said the fire department was already operating off these policies. Portney responded by requesting that the fire department stop immediately, and follow the county policy. **Fire Captain Dowdy paused, and said, "All right, boy" in a condescending and derogatory manner, and hung up on Portney**. The use of the word "boy" to Mr. Portney, was an unsubtle racist term that is used with the intent to subordinate and emasculate Black men, and was akin to Mr. Dowdy calling Mr. Portney the "n" word.

76.    Around mid-December 2022, County of Lake employee Crystle Williams (at the time, Staff Analyst for CA Children's Services) came to Mr. Portney's office door, and derisively told Mr. Portney that she heard he was having a problem with the Fire Chiefs, and she heard the Fire Chiefs were calling him "the hard 'R'" (Portney took this to mean the "N-" word), "boy,"

and "monkey."

77.    On December 22, 2022, Mr. Portney reported a harassment complaint based on gender/sex, by Mr. Coddington, against Cindy Silva Brakett, to Ms. Grant.

78.    Also on December 22, 2022, Mr. Portney received a harassment complaint against Lynn Brookes from Health Programs Coordinator I2, Grace, who is a minority. Mr. Portney told Ms. Grant that he had concerns with HR's ability to handle these complaints, and that employees did not feel protected when raising harassment issues. In Ms. Grace's complaint, among others, she reported,

•    that she had previously complained to her supervisor in late April 2022 about Ms. Brookes bullying behavior during Grace's training;

•    Grace also complained about Ms. Brookes' apparent retaliation for Grace's above complaint against Ms. Brookes, by stating that Grace "is such a cunt" during a grant/budget meeting with several people present in the summer;

•    Grace also complained that Ms. Brookes told a caller who was concerned with monkeypox, "You should cut off your penis huh?!" Ms. Brookes also laughed;

•    Ms. Brookes was supposed to train Grace, who did not want to train her.  Ms. Brookes gave her misleading information regarding vaccines;

•    Ms. Brookes told Grace not to follow CDC and State recommendations for transporting refrigerated vaccines.

79.    Mr. Portney emailed County Counsel Anita Grant that he received a harassment complaint from Ms. Guintivano and that he had little faith in HR's ability to handle the accusations and that he did not believe staff were protected when claims of harassment are brought forward. Ms. Grant recommended an outside investigator.  Mr. Portney agreed, emailing that the complaints they were receiving were alarming and that he desired a safe environment.

80.    On December 27, 2022, Mr. Portney put in a request for FMLA/CFRA leave to care for his newborn child. On January 3, 2023, leave was approved for Mr. Portney, by HR

Director Dianna Rico for Pam Samac, for January 11, 2023 to February 8, 2023 leave.

**2023**

81.    From January 11-February 8, 2023, Mr. Portney was approved for FMLA/CFRA leave for baby bonding.

82.    On January 23, 2023, Dwight Harrington complained to Mr.Portney and others that he had been retaliated against for authoring a letter of support for Mr. Portney.

> Good morning Rainy,
>
> I've given this a lot of consideration and feel you're asking me to work in an unsafe environment given the treatment I've received in retaliation for my authoring a letter of support in Director Portney. In proximity to that office is Amanda and Charlene who co-authored the letter of no confidence in Director Portney, which I found to be wholly inappropriate as I watched Deputy Director Baker direct both of them to consider authoring such an item and leak it to the press before her termination. I also feel I am not completely out-of-line for considering this possible retaliation for my speaking about staffs worries Iyesha Miller is deflecting some of her duties – which as a result of, I would like to work with our new Equity Coordinator in building a more supportive and transparent framework to help staff feel more heard. LaTasha, Kelly, and I have been through a lot as a result of the previous deputy director's behaviors and emboldening of harassment among her favored colleagues. I would feel most productive and safe continuing to work alongside them at the 858 office. I am open to maintaining that as a secondary office, but worry about the implications for my productivity and health If forced to work in such close proximity to people who quite honestly hate me. I've watched both JP and Philip be the targets of ridicule from the clique in Public Health and do not want to be subject to it too.

83.    On January 26, 2023, Matthew Rothstein, Ms. Parker's Deputy, and Ms. Parker, contacted Mr. Portney, asking him to make a presentation for the BOS. Mr. Portney asked if it could wait until he was back from Paternity Leave. Ms. Parker texted, "It's just one day." Mr. Portney worked for 12 hours but did not receive pay for working during his leave and was not able to take a different date of leave to make up for his work during leave.

84.    In February of 2023 Dwight Coddington, Latasha Branch, and Cindy Silva Brakett reported to Mr. Portney that their offices' had been broken into after hours, and their personal belongings were missing, and or moved. Mr. Portney reported this to HR Pam Samac and she recommended that he check with Celia Pulido to see camera footage and gain a report of the staff key-in, where staff have to input a code to turn off the office alarm.

85.    When Mr Portney asked Ms. Pulido for this information, she told Mr. Portney that the camera footage was deleted, and that the Key-in information was erased. Mr. Portney reported this to Ms. Samac, and no investigation by HR went into the matter. Ms. Branch reported to Mr. Portney that these types of events, such as personal items being missing, started happening in November 2022.

86.    On or about February 6, 2023, Mr. Portney whistleblew to County of Lake's investigator, Madeline Buitelaar, in an email, by providing documentation regarding the falsehoods in the accusations made by the Cal-Fire Chief, Paul Duncan, and LCHD staff.

87.    On or around February 26, 2023, Mr. Portney reported to CAO Parker and the BOS pertaining to significant safety concerns and violations in the County's ambulatory care system, including violations of Lake County Ordinance No. 2687, within the Fire Department's Emergency Services Agency which did not meet the minimum standards in Ordinance No. 2687 of the Lake County Code. Emergency and Non-Emergency Services (83.1 Permits and Permittees, 83.2 Ambulance Operations Standards, 83.3 Non-Emergency Services Operation, and 89.1 Department Responsibilities, including the failure to prioritize emergency response over inter-facility transfers. Ambulance and staff services were unavailable for emergencies due to resource shortages. The Fire Department's failure to maintain emergency readiness endangered public health and safety by leaving 9-1-1 calls unanswered.

88.    On or about February 27, 2023, Mr. Portney was informed by Sutter Lakeside Hospital CEO that Tim Stephens and Adventist Health COO, Dr. Evan Bloom, about delayed ground transfers, with ambulance providers refusing inter-facility transfers on 2/25/2023 at 1315. Mr. Portney immediately reported this information to CAO Parker and the BOS in an email, explaining that this directly violated the Lake County EMS Ordinance. Mr. Portney further reported that he confirmed refusals by ambulance providers under Fire Chief Reitz's jurisdiction. The Hospitals that had delayed transfers were causing patient harm and in violation of Ordinance No. 2687, which requires prioritization of emergency services.

89.    On March 6, 2023, Supervisor Bruno Sabatier emailed Mr. Portney for dates so

"we can sit with the hospitals and fire districts to discuss the future of IFTs and EMS services." On March 6, 2023, Mr. Portney responded, "We have to let the process work without retaliation and harassment....not a Fire Department or hospital decision ...."

90.    On March 7, 2023, Mr. Portney requested FMLA/CFRA leave from April 3, 2023 to April 24, 2023. This request for CFRA leave was approved, for baby bonding.

91.    In or around March 7-8, 2023, Mr. Portney reported to Ms. Samac that his laptop was left at his office and was now not working, and in a different position than he left it. He also emailed Ms. Samac that Apple expected that it was water damage. Mr. Portney told Ms. Samac that he believed this was not the first occurrence of his office being broken into. Ms. Samac asked who had keys to his office. Mr. Portney said he thought only he and the interim Public Health Officer, Carl Sporer, had a key (Mr. Portney shared an office with Mr. Sporer). Ms. Samac advised Mr. Portney to determine who had the keys to his office and collect them.

92.    On or around March 7 or 8th, 2023, Mr. Portney told Amanda Frazell who had a key to the safe that had all the keys to all the offices, that he needed all the keys to his office because he had confidential information in his office. She said, "You need to trust us." Mr. Portney said it is not a matter of trust, it is a matter of confidentiality for you and all the other staff (for example, Mr. Portney had a disciplinary action on his desk for someone that was in a position different on March 7, than he left it). Ms. Frazell did not respond, or give Mr. Portney the keys, and walked away. Mr. Portney asked Ms. Hanlon if she could get the keys. About a week later she said she was able to round up keys she was able to find for her office and Mr. Portney's and that Ms. Hanlon would keep the extra keys in her office.

93.    On March 8, 2023, Mr. Portney emailed county counsel, Anita Grant, that attorney Carlton Briggs was representing him and that he could discuss all matters on his behalf, and that Mr. Briggs would reach out to her tomorrow.

94.    On or around March 8, 2023, unbeknownst to Mr. Portney beforehand, Anita Grant met with the Lakeport NAACP and discussed his employment, and aspects of the

investigation into the VONC letter. At no time did Mr. Portney ask County of Lake to discuss his employment with the NAACP or give consent for them to discuss his employment. Mr. Portney was stunned that the County of Lake was sharing matters regarding his employment with the community.

95.     On March 11, 2023, Sutter Health Hospital and Adventist Health reported that 911 calls were unanswered or delayed while inter-facility transfers were refused by Fire Department EMS Services. Lakeport and North Shore Fire Departments admitted resource shortages. Fire Departments failed to comply wtih Ordinance No. 2687 of the Lake County Code. Mr. Portney immediately reported this to the BOS and CAO Parker.

96.     On March 14, 2023, Mr. Portney reported to Pam Samac documentation from Fire Chief Reitz who outlined ambulance 911 refusals. In a follow up phone call, Mr. Portney explained that these violated Lake County Ordinance No. 2687, creating safety risks for the community as well as the hospital. Ms. Samac dismissed his concerns, stating, "I am not sure why you are copying me as I don't know anything about this."

97.     Also on March 14, 2023, Mr. Portney presented consideration to the BOS for funding for Mike Marsh EMS consulting for $20,000 for coordinating the emergency ambulance strike team that responded to the needs of the community due to the lack of response for the local EMS response. Mr. Portney presented the item to the BOS, Sutter Lakeside Representative Tim Stephens (CEO of Sutter), Dr. Evan Bloom (COO Adventist), Sutter Lakeside Chief Nurse Executive Pauline Orr, and Adventist Health Representative, Ed Beltram, were present and gave a plea to the BOS to address and fix the ambulance transportation issue citing that because of the lack of services their patients are needlessly suffering with long wait time at hospitals when they need to be transferred for critical care.

98.    In around March 15, 2023, Mr. Portney received reports from his staff that their offices were being broken into: Mr. Portney's Public Information Officer (Dwight Coddington); Staff Service Analyst (Kelli Hanlon, who worked only with Mr. Portney); Health Program Coordinator for COVID-19 outreach (LaTasha Branch), were also broken into. Mr. Portney forwarded their complaints to HR, Pam Samac. Ms. Samac never communicated to Mr. Portney about what if anything, the County would do to investigate these break-ins, or to prevent this conduct from occurring in the future.

99.    On or around March 17, 2023, Mr. Portney emailed a complaint against Danielle Woodford to HR Pam Samac, HR Diana Rico, and Casey Moreno. Mr. Portney asked HR to investigate allegations of harassment and take appropriate action. Mr. Portney complained about Ms. Woodford making harassing comments based on one's gender (being a male and that all males are lazy), and hostile behavior toward particularly LaTasha Branch ( a Black woman), James, and Kelly W. Mr. Portney reported that Ms. Branch had witnessed the bullying of James by Ms. Woodford and Cindy Silva-Brackett, amongst other complaints.

100.    On or around March 28, 2023, during his evaluation meeting with the BOS, COA Parker, and County Counsel, Mr. Portney was presented with a document by the BOS titled Lake County Fire Chiefs' Association submitted by Willie Sepeta, and addressed to the BOS presented on 3/13/2023, "calling into question the need for the Mike Marsh EMS Consulting for Ambulance Strike Team Support" further saying "We feel the $20,000.00 would best benefit our communities and stakeholders/partners by investing those funds to extend the NCEMS/Lake County EMS Liaison position with current employee Morgan Fox. Thank you for your time." Mr. Portney told the BOS that this effort to undermine his authority and attempt to direct the BOS behind his back to encourage him to allocate funds to the Fire

Department was absolutely inappropriate. Mr. Portney outlined to the BOS the continued violations of the Lake County Ordinance by the Fire Department ("health and safety violations within the Fire Department's Emergency Services Agency, which fell short of the standards laid out in Ordinance No. 2687 of the Lake County Code Sec. 9-83. Emergency and Non-Emergency Services (83.1 Permits and Permittees, 83.2 Ambulance Operations Standards, 83.3 Non-Emergency Services Operation, & 89.1 Department Responsibilities).

101.    From April - August 2023, Mr. Portney also had numerous calls from blocked numbers with racist comments such as the "N" word repeated in fast succession, and "Go back to Africa." Mr. Portney reported these instances to the NAACP of Lake County, who advised Mr. Portney that these types of events happen to them often as well. Mr. Portney also reported these events to a police officer with the Lake County Police Department.

102.    On April 1, 2023, Mr. Portney reported to Mr. Guintivano that Supervisors Bruno and Green seem to be providing materials and agenda items to Fire Chief Sepeta prior to public knowledge and that someone on the BOS was providing the Fire Department with information regarding the Health Department's budget, as the Fire Department personnel asked if he had extra money from specific budgets to buy materials and supplies, which was inappropriate. Mr. Portney reported further that the Fire Chiefs were not following the ordinance and were using their own rules and that the Fire Department was not allowing private ambulances. Mr. Portney further reported that he did not want patients to continually die unnecessarily.

103.    On April 18, 2023, during a public BOS meeting, Mr Portney presented a proposal to contract with Endpoint EMS Consulting in response to the second RFP to evaluate the County's inter-facility transport system and address ordinance violations.  Fire

Chiefs Patrick Reitz and Ciancio (Northshore) and Sapeta (Lake County Fire Protection District) berated Mr. Portney and accused him of being unfit for his position and argued the funds should go to AP Triton, a competing bidder for the contract who was not selected. Supervisors Sabatier and Green recommended pausing on the contract and the BOS voted to pause the contract.

104.    On or about April 18, 2023, the Board of Supervisors told Mr. Portney to table this, since the Fire Department hired AP Triton out of its own funds.

105.    On or around April 19, 2023, Mr. Portney emailed a 4 page harassment complaint (with 2 pages typed) to Pam Samac, Ms. Parker, Anita Grant, and Mr. Briggs. His complaint was based on race and the unlawful activity of the Fire Chiefs attempting to effect government business so they could get the contractor they wanted to be awarded a government contract that was the subject of RFP 1 and RFP 2. Mr. Portney further reported, "I have heard that the Fire Chiefs listed here have used derogatory/slang statements toward me, . . . B-wor[d], N-word, and most recently, a Fire Chief referred to me as "Boy" in a phone conversation . . . ." Mr. Portney also reported, among other matters, that he wanted the racial slurs, "and misconduct like BAV [Brown Act Violations] from the Fire Chiefs Association and a few of the County of Lake by the BOS to stop. I have little hope for change, considering I have been advocating for support for the last 6 months, with little communication from those I am reaching out to for support."

106.    On or around April 20, 2023, Mr. Portney complained to Ms. Samac of ongoing harassment, bullying, and being subject to false accusations. Mr. Portney noted that anger from people could be seen during public board meetings and that he has been subjected to the same in person. Mr. Portney wrote that other minority colleagues have faced similar experiences and

that he was concerned about his and their well being. Mr. Portney further reported receiving anonymous phone calls expressing disgruntlement and hate due to his efforts to address health equity and racism as a public health principle. Mr. Portney reported that he was concerned for his safety and his family's, and so requested to work remotely. Supervisor Pyska asked Mr. Portney where he would work remotely. Mr. Portney said he thought it would be best if he moved out of Lakeport to Hidden Valley (the next town). Supervisor Pyska disregarded his request and said, "That is still in the County." Mr. Portney reported that people had called him telling him that he "should go back to Africa."

107.    On or about April 26, 2023, Ms. Parker emailed Mr. Portney that his request to work remotely would need to be approved and signed by the Board at his follow-up evaluation, as the Board approves remote work requests. Ms. Parker noted that she scheduled his follow up evaluation with the Board on May 2, 2023 as a closed session item.

108.    On April 26, 2023, Ms. Samac emailed Mr. Portney and others that Van Dermyden Makus Investigations Law Firm had been engaged to investigate his complaints of harassment, discrimination, bullying, and/or retaliation. Christina Petricca was the attorney investigator assigned to investigate these allegations. Mr. Portney  expressed concern via an email to Pam Samac, County Counsel, and Susan Parker, about the County's failure to provide follow-up or results on his harassment complaint in December 2022.

109.    On April 28, 2023, Ms. Petricca introduced herself via email to Mr. Portney and confirmed she was conducting an investigation into his complaints.

110.    On April 28, 2024, Mr. Briggs replied to Ms. Petricca's email confirming that he was representing Ms. Portney.

111.    On May 1, 2023, Ms. Petricca emailed Mr. Portney that she was an attorney retained by Lake County to conduct an investigation into his concerns.

112.    On May 2, 2023, during a closed session BOS meeting for Mr. Portney's Employee Evaluation (Ms. Parker was also present and County Counsel), Mr. Portney reiterated and expressed the ongoing violations of Ordinance No. 2687. Mr. Portney reported to the BOS that health and safety codes were still being violated by the Fire Department, the Lake County Ambulance Ordinance was still not being followed, that the Fire Chiefs were still interfering with the RFP.  Mr. Portney said there was lack of support from the BOS, County Counsel, and CAO was absent (meaning of no help). Mr. Portney told the BOS that he felt that they were internally blocking his efforts to address the issues with the RFP and Fire Chiefs to favor and protect the Fire Department. Mr. Portney recommended that they allow him to continue to have Endpoint Consulting address these violations and policy failures. Supervisors Sabatier and Green stated they were aware there were problems with the Fire Departments' EMS operations, but said to cancel the second RFP decision to award the contract to EndPoint Consulting. Mr. Portney objected, saying that Endpoint was the validly chosen proper candidate who was chosen by a panel after the first RFP that was also thrown out. The BOS then said to table the topic for a follow-up meeting with the BOS and Mr. Portney, but the meeting never occurred.

113.    On or around May 4th, 2023, Mr. Portney thereafter had a Zoom meeting with Ms. Petricca and Mr. Briggs, and Mr. Portney reported what he believed to be unlawful conduct, including unlawful harassment, discrimination, and retaliation, violations of laws, including:

- that a Fire Chief referred to Mr. Portney an "boy" in a telephone conversation;
- that staff reported to him that he was being referred to as a "nigger" and "monkey";
- Mr. Portney referenced a complaint by former HR Director (a Black woman), Pam Nichols, against Ms. Parker wherein Ms. Parker was accused of harassing behavior;

- that there were violations of the ambulance ordinance by the Fire EMS providers, Browns Act Violations taking place by the BOS having closed door conversations and decision making by the BOS which should be public discussion, including but not limited to:

→    Mr. Portney reported that the BOS were engaging in decision making outside of properly noticed public meetings by holding private, sequential conversations to make decisions, bypassing public transparency.

→    Mr. Portney reported that Supervisors Green and Sabatier were actively participating in the EMCC/IFT committees together, and creating and reviewing policy in these meetings, then taking that policy they created and presenting it back to themselves in BOS open session for approval. Mr. Portney said this was a conflict of interest and that the EMCC meetings did not follow Brown Act Compliance.

→    Mr. Portney reported that the BOS would list closed session meetings under the pretext of "employee evaluation" for Mr. Portney. During these sessions, the BOS would discuss county business, including the Fire Chiefs' obstruction into the RFP process so that its chosen contractor would be used. These discussions directly impacted county operations and decision-making, were not agendized, and in violation of the Brown Act, thereby bypassing public transparency, and a fair and equal bidding process as required.

→    the Board used closed sessions to deliberate on the RFPs and public contracting which are not allowed exceptions. All discussion of the RFPs were not in an open forum in violation of the transparency requirements of the Brown Act.

→    Mr. Portney reported that he was asked to make a presentation and present it while he was on approved paternity leave. Mr. Portney agreed because he feared retaliation if he did not. He spent about 2 days and 12 hours preparing the presentation;

→    Mr. Portney reported that the LEMSA contracted by the County was not fulfilling its contract resulting in limited to no monitoring of local EMS services. Mr. Portney

further reported that the BOS had been repeatedly notified of these failures by LEMSA, but failed to enforce their requirements under the contract with the County;

→       Mr. Portney reported inadequate ambulance staffing by the local EMS agency, and reported how this was a violation of the ordinance, and health and safety codes. Mr. Portney reported continually informing the BOS of this inadequacy.

→       Mr. Portney also reported that the County was in violation of California's Health and Safety Code requirement by not having a full time Public Health Officer, and as a result, the clinical providers (Public Health Nurses) had no clinical supervision of their patient care. Mr. Portney further reported that he repeatedly tried to get the County to comply with the Health and Safety Code requirements and reported that he has complained repeatedly about the lack of a full time PHO.

→       Mr. Portney reported workplace harassment and retaliation by Lake County staff being motivated by race and in retaliation for Mr. Portney complaining that the VONC was based on race and in retaliation for the RFP not going the way the Fire Chiefs wanted it to, and in retaliation for the termination of Jen Baker as a result of Mr. Portney's complaint. Mr. Portney further reported that he felt HR was contributing Mr. Portney being retaliated because Pam Samac was friends staff and she was protecting staff but not Mr. Portney.

→       Mr. Portney reported that Dwight Coddington complained of harassment and that Mr. Coddington also complained about others making racist derogatory comments about Mr. Portney in Mr. Harrington's presence, which was not addressed by Human Resources.

→       Mr. Portney reported that the County leaked the VONC to Lake County News immediately after it occurred and before any investigation took place.

→       Mr. Portney reported that his office was being repeatedly broken into and that his personal items were being tampered with.

114.    On or around May 9, 2023, the Fire Department (Lakeport Fire Dept.) put on

their agenda for a vote of no confidence for Health Services Director, Mr. Portney.

115.   On May 9, 2023, Dwight Coddington emailed Mr. Portney, the Board of Supervisors, Ms. Samac, the Grand Jury, and Rainy Grafton, that he received Ms. Samac's voice mail but that he was requesting all future correspondence be in writing. Mr. Coddington wrote that he was not interested in participating in another investigation as [a prior investigation] felt as if it was meant to discredit those who reported harassment, discrimination, retaliation, and prejudice the employees have witnesses and endured. Mr. Coddington further wrote the County was obliged to provide him with a harassment free environment but instead encouraged and empowered individuals by declining to discipline. Mr. Coddington further wrote that "Jennifer Baker championed the horrible character assasination of Mr. Portney, empowered harassment, and eventually coordinated with those she she [sic] promoted . . . to retaliate and publicly destroy Mr. Portney's reputation, career, and the precious experience of his son's birth."

116.   Mr. Portney emailed the Grand Jury that the harassment and targeting against him and staff needs to be investigated and that he could attest to Mr. Coddington's letter and would support the Grand Jury's investigation into his letter and the falsehoods in the Vote of No Confidence.

117.   In or around May 16, 2023, Mr. Coddington informed Mr. Portney and Ms. Petriccia that Ms. Baker had given him the nickname "Skippy" and referred to him as Skippy to others often in front of Mr. Coddington. Mr. Portney viewed this as a derogatory racist comment, and that "Skippy" was a comparison to the color of Skippy peanut butter and Mr. Portney's light skin color as a mixed race Black man, also having a Caucasian parent.

118.   On or around May 19, 2023, Mr. Portney and Ms. Petricca had a second Zoom meeting wherein Mr. Portney further complained about continued harassment by the Fire Chiefs and the County not having a full-time Public Health Officer ("PHO") which is a violation of health and safety codes. Before this second Zoom meeting, Mr. Portney had sent

Ms. Petricca documents that showed that Ms. Parker was passing Dr. Karl Sporer off as the County's PHO, who was only a very part-time medical consultant pursuant to his contract with the County.

119.    On May 31, 2023, Pam Samac emailed Mr. Portney re: "Outcome of Complaint Investigation Conducted by Oppenheimer Investigations Group" and advised that the investigator found that Chris McSorley subjected Mr. Portney to harassment and abusive conduct. Mr. Portney was informed by Ms. Samac, The County's Harassment Policy defines "harassment" as (1) derogatory comments, jokes, slurs, or epithets; (2) assault, impeding or blocking movement, gestures, any physical interference with normal work movement; (3) derogatory posters, letters, poems, graffiti, cartoons, or drawings; or (4) sexual harassment. Further, California law defines "abusive conduct" as conduct in the workplace, with malice, that a reasonable person would find hostile, offensive, and unrelated to an employer's legitimate business interests. Abusive conduct may include repeated infliction of verbal abuse, such as the use of derogatory remarks, insults, and epithets, verbal or physical conduct that a reasonable person would find threatening, intimidating, or humiliating, or the gratuitous sabotage or undermining of a person's work performance.

120.    On May 31, 2023, Mr. Portney emailed Mr. Guintivano that the Oppenheimer investigation concluded that McSorley was found to have engaged in harassing and abusive conduct toward him and as a direct consequence of the harassment he incurred expenses including a defamation/reputation consultant who charged $1500 down payment and monthly fees of $750 to shield him from false claims that McSorely was perpetuating and the continued effort with staff members coordinating with Lake County news to find ways around his attempt to block the attacks. Mr. Portney explained that the costs caused considerable financial strain and requested guidance on how he might seek reimbursement. Mr. Guintivano never responded to Mr. Portney.

121.    From June 1-July 3, 2023, Mr. Portney baby bonding FMLA/CFRA leave.

122.    On June 6, 2023, Mr. Portney reported in an email to Christina J. Petricca that Liberty Francis filed a grievance against him and that he believed the grievance was in retaliation for his previous complaints of racism, harassment, sexism, and ageism within the context of a now closed investigation involving the false allegations in the VONC (Vote of No Confidence).

123.    On or around June 7, 2023, Mr. Portney, Mr. Guintivano, and Ms. Samac received Ms. McSorley's Civil Rights Department charge electronically. Mr. Portney electronically asked Mr. Guintivano and Ms. Samac if he needed to respond and neither ever answered his question.

124.    On June 20, 2023, Alik Ourfalian emailed Mr. Portney's counsel and Ms. Samac a summary of the outcome of the "OIG investigation" which found that McSorley, Woodford, and Lynn Brookes engaged in harassing conduct toward Mr. Portney. This investigation found that race was not a factor, which Mr. Portney disputes.

125.    On July 3, 2023, Shane French the Director of Information Technology emailed Mr. Portney that Lynn Brooks still had access to the Health Service Department Server and emails. He told Mr. Portney this because Mr. Portney noticed activity in Lynn Brooks employee file, and he was concerned about a hack or HIPPA violations if someone had access outside of the network. Mr. French said the only way this would be possible is if there was a transfer of a staff member from one department to another. Mr. French apologized for the policy violation and acknowledged the county's "Standard Operating Procedure" failure. Mr. Portney expressed to Mr. French that he was concerned about HIPPA violations because Lynn Brooks was no longer an employee. Kelli Hanlon & Nurse Kristina Vessingar informed Mr. Portney of Ms. Brooks continuing to defame Mr. Portney. Mr. Portney sent a message to the Board of Supervisors, Mr. Guintivano, and Wellpath Director David G. No one responded to Mr. Portney's complaint regarding Lynn Brooks.

126.    On or around July 6, 2023, when Portney was on a phone call with the CEO of Sutter Health, Timothy Stevens, Supervisor Bruno, and the CEO of Adventist Health, Colleen

Assavapisitkul, to discuss how to get the Fire Departments to follow ambulance ordinances, **Stevens said that he talked with Fire Chief Patrick Reitz the other day, and Reitz told Stevens that "he was not going to talk to people like you."** Stevens said Reitz was referring to Portney. **Portney took this as a racist comment.**

127.   Also on July 6, 2023, Mr. Portney observed he had two flat tires after he got off of work. When he took his car in the same day, he learned that he had nails in all four of his tires, and had to replace all 4 tires.

128.   On July 19, 2023, Ms. Petricca emailed Mr. Portney that she did not have authority to investigate most of his complaints.  She wrote that the County only authorized her to investigate only the following allegations:

-   You alleged that since approximately December 2022 Lake County Fire Protection District Chief William Sapeta, North Shore Fire Protection District Chief Michael Ciancio, South Lake Fire Protection District Chief Paul Duncan and Lakeport Fire Protection Chief Patrick Reitz have made race-based comments about you.

-   You alleged that during a phone call in December 2022 and at an IFT EMCC Meeting in April 2023, Kelseyville Fire Protection District Captain Jim Dowdy made race-based comments.

-   You alleged that on January 26, 2023 Chief Administrative Officer Susan Parker asked you to return from paternity leave to attend a meeting on January 31, 2023.

-   You alleged that during a meeting on March 30, 2023, between the local Fire Chiefs, Sapeta made "negative" comments about you.

-   You alleged that in early 2023, Public Health Nurse Carol Morgan "disparaged" you to a new staff member.

I understand you have made additional allegations, however, I have not been authorized to investigate the other allegations you have made. If you have any questions about the scope of the investigation please contact Pam Samac.

129.   The County did not therefore authorize Ms. Petricca to investigate Mr. Portney's numerous complaints against the BOS for Brown Act violations, the County not having a lawful PHO, and other complaints.

130.   On August 2, 2023, Mr. Portney reported to Lake County's investigator, Christina J. Petricca that he felt he would be retaliated and fired for the complaints he made. Mr. Portney

reported that he was being excluded from events, and Ms. Parker was directing his Deputy Director to do tasks that he should be doing, and people were being moved and/or recruited from his department to work in Ms. Parker's department and other County agencies.

131.    On August 3, 2023, Mr. Portney emailed Lake County News regarding a recent article about him being false, and that the accusations against him in the VONC were false, that the Oppenheimer Investigation Group concluded that the allegations made against him in the Vote of No Confidence were unfounded and that it was concluded that Mr. Portney was harassed. He requested that some articles be taken down.

132.    On August 4, 2023, Ms. Samac emailed Ms. Grafton and cc'd Mr. Portney a list of the things that Ms. Grafton thought they would need for the new PHO. Ms. Samac asked Ms. Grafton to add to the list as needed. Mr. Portney emailed both minutes later, asking if there was a reason the request was presented to Ms. Grafton and not him, given the organization chart. Mr. Portney did not receive a response.

133.    On August 4, 2023, Mr. Guintivano informed Mr. Portney's counsel in a telephone conversation that Mr. Portney violated policy by contacting Lake County News and discussing the Oppenheimer investigation results, despite it being Mr. Portney's First Amendment Right to do so. Mr. Guintivano disagreed.

134.    On August 4, 2023, Mr. Portney complained to Ms. Parker via email that she and Ms. Samac delegated tasks to Deputy Director Rainy Grafton that should have been Mr. Portney's based on the organizational chart. He complained that he asked her and Ms. Samac before, and was asking again if there was a reason these tasks were being delegated to his Deputy Director.  Mr. Portney then reported to Ms. Petricca in an email that he had essentially been stripped of duties and that he asked for justification but received no response. Ms. Petricca also did not respond.

135.    In or around early to mid-August, 2023, Ms. Samac asked Mr. Portney to move out of his office. As a result, he worked in the lobby or common areas as there was no available offices in the main building or the satellite location.

**August 16, 2023 Ad Hoc Meeting**

136.    On August 16, 2023, Ms. Parker requested an ad hoc meeting with Mr. Portney, Supervisor Eddie Crandall, and Board Chair Jessica Pyska. Once Mr. Portney arrived at Ms. Parker's office, she noticed that only Ms. Parker and Supervisor Pyska were present. Mr. Portney asked where Supervisor Eddie Crandall was, and Ms. Parker replied, "He is busy and will not be joining us." Mr. Portney expressed his concern, saying, "I thought the agreement was that two board supervisors would be present for these conversations." Board Chair Jessica Pyska responded, "Well, we are here, have a seat."

137.    Ms. Parker provided Mr. Portney with his May 2023 Goals and Objectives list, which was given to him after his last evaluation (and Mr. Portney provided it back to Ms. Parker before 8/16/23). Ms. Parker provided what he has given her, which was signed by Mr. Portney on May 15, 2023, and highlighted in pink and green pen. Ms. Parker also gave him an unsigned Goals and Priorities page without any highlighting. Ms. Parker asked Mr. Portney to sign the unsigned Goals and Priorities document. Mr. Portney noticed the unsigned document was different from the one he signed on May 15, 2023. Mr. Portney asked Ms. Parker why one copy of the Goals and Priorities document was missing information. Ms. Parker said, "It looks the same to me; can you sign it, please?" Mr. Portney informed her that he would need to review it first as he could tell the new document Ms. Parker wanted Mr. Portney to sign was different. Ms. Parker insisted, "It's the same thing; if you can just sign it and give it back to me now." Mr. Portney reiterated that he would need to review it because the documents were not the same. Mr. Portney pointed out the missing text in the unsigned document. Mr. Portney also pointed out that the new document he was being presented with to sign was backdated to May 2, 2023, and requested a new copy of the document with the current date. Ms. Parker did not respond in any way to Mr. Portney's comments.

138.    Ms. Parker asked "Have you completed the 7 Recommendations in the After Action Report, Any Positive Change MOU, and Tobacco Retail License" Mr. Portney responded that the seven (7) Recommendations in the After Action had been addressed, and

said there was only one (1) recommendation that pertains to the Health Department and said he had a meeting with the partners to address the issue the other six (6), that he recommended the Board establish a point person to address the issues because he does not oversee those agencies.

139.    Ms. Parker said, "Ok, what about Any Positive Change MOU?" Mr. Portney replied the MOU was complete, and was with APC's legal counsel for review. Mr. Portney told Supervisor Pyska and Ms. Parker that APC was reluctant to sign because they do not trust the Board of Supervisors because of the historical political attacks on their harm reduction program. Mr. Portney said Annina (van Vourene, CEO for Any Positive Change ("APC") was particularly upset about Supervisor Crandall's wife calling for violence against Annina and Any Positive Change. Ms. Parker asked about the violence, and Mr. Portney said you will need to talk to APC or Supervisor Crandall. Mr. Portney said that he had completed the task and was waiting for a copy to come back to him after their review and said that APC is approved by the State, and APC does not have to sign a MOU with the County if they do not want to and the County cannot force APC to sign a contract to engage with the County if it does not desire to do so.  Mr. Portney also said that Kim Tengermann and Philip Wegner told him that they were witnesses to the County's appointed PHO yelling at Annina in a recent meeting which did not help with the County's effort.

140.    Ms. Parker then asked, "What about the TRL?, you know, the Tobacco Retail License?" Mr. Portney said the documents should be with County Counsel, as he had asked his Deputy to submit the TRL for review and said that he would check on it. Mr. Portney expressed that he accomplished the objective of completing the TRL. He then told Ms. Parker and Supervisor Pyska that it was difficult to get done because he was still  experiencing harassment, retaliation, and bullying. Mr. Portney told them that Liberty Francis was refusing to participate in the TRL process as her job function, and was refusing to take direction from Mr. Portney.  Mr. Portney further reported that Supervisor Bruno asked Ms. Francis to work on this task, but Ms. Francis refused.

141.    Supervisor Pyska then asked Mr. Portney how he thought he did with the objectives. Mr. Portney told Supervisor Pyska that he successfully completed them, and showed them both supporting documentation, and said that he found it incredibly difficult due to the bullying, harassment, and insubordination that continued, despite requests for support from HR (Pam Samac). Supervisor Pyska expressed surprise, "That is still going on? There's more?" Mr. Portney confirmed, "Yes, it's still going on, and I am disappointed that I have not been given any further outcome to my requests to investigate the Vote of No Confidence and the harassment by identified staff members," and listed the names of the individuals who signed the vote of no confidence who were still harassing him. Supervisor Pyska said, "Wait, Paul Duncan hasn't apologized to you?" Mr. Portney replied, "No." Supervisor Pyska then said, "Jonathan, you are the director of the department; you need to figure it out." Mr. Portney responded, "I am trying, but I'm not getting the support from HR to be able to do my job." Ms. Parker added, "Well, these kinds of processes can take some time, and it's costing a lot of money." Ms. Parker paused for a few seconds and then said, "We invest in our young people, you know, like Matthew." Mr. Portney said, "Well, that's great for Matthew, I'm happy for him."

142.    Mr. Portney asked Ms. Parker and Supervisor Pyska when he should be expecting the result of his harassment investigation and what was going to be done about getting support when it comes to the insubordination of Health Services staff. Ms. Parker looked at Supervisor Pyska, quickly stood up, walked behind Mr. Portney, and made a motion with her hand towards her neck/throat to Supervisor Pyska, suggesting to stop the conversation (Mr. Portney could see this in the reflection of the window in Ms. Parker's office because her office has floor-to-ceiling glass). Mr. Portney asked Ms. Parker, "What was that about?" She dismissed it, saying, "Oh, nothing," and began to sit back down, then said, "I think the word you're looking for is 'difficult'." Mr. Portney corrected her, "No, the words are 'insubordination' and 'harassment.'"

143.    Ms. Parker then said, "How about we end on a positive note? What is something good that is going on with you?" Mr. Portney responded that he was enjoying his time with his

newborn and that he was looking forward to taking paternity leave. Ms. Parker asked, "When are you taking Paternity Leave again?" Mr. Portney gave her the predicted dates of October 23, 2023-November 6, 2023.  Ms. Parker and Supervisor Pyska wrote notes. Ms. Parker then concluded the meeting. At no time was Mr. Portney or his work performance criticized.

**Ms. Parker Approves Merit Pay Increase for Mr. Portney**

144.    On August 16, 2023, Ms. Parker signed an approval for Mr. Portney to receive a merit increase to $12,608.00 per month (effective retroactive to July 22, 2023).

145.    On August 17, 2023, Ms. Parker, Ms. Rico, and Mr. Portney electronically signed Mr. Portney's merit increase

146.    On August 25, 2023, a file was created "Adopt Proclamation Designating the Thirty-First Day of August as International Overdose Awareness Day" for the BOS on September 11, 2023.

147.    On August 30, 2023, Mr. Portney emailed the Board of Supervisors and expressed that Lynn Brookes, who was now working at Wellpath, after she was identified as harassing him, was continuing to harass and defame him to his staff at work gatherings. Mr. Portney expressed concern for how this was impacting his working relationship with Wellpath. Mr. Portney reported that Lynn Brookes was making comments that he was not qualified for his job, that he was bad at his job, and that Mr. Portney should not be working in "this county." He did not receive any response.

148.    On or around the last week of August/first week of September 2023, a Grand Juror came to Mr. Portney's office. Mr. Portney asked if the Grand Jury received the complaint he emailed, and if they would be looking into his claims of harassment. The Grand Juror responded they were looking into it.

**Portney's repeated requests for investigation into unreported Jail Death.**

149.    On or around the end of August, 2023, David Garzoli, the Lake County Jail's Wellpath Medical Director, informed Mr. Portney of an inmate drug overdose and death.

---

150.    On or about September 1, 2023, Dr. Noemi Doohman started working as the new Lake County Public Health Officer. The County of Lake had been unlawfully without a full-time Public Health Officer which Mr. Portney had complained about for the past year and to Ms. Petriccia. Mr. Portney met with Dr. Doohan and notified her of an overdose and death in the jail and told her an investigation was required into what happened.

151.    On or about September 6, 2023, Mr. Portney met in person with Dr. Doohan for about an hour and a half. Dr. Doohan asked Mr. Portney to help her establish goals and objectives for her job to present to Ms. Parker later that afternoon. Mr. Portney said he could give her his recommendations. Mr. Portney again mentioned the overdose in the jail, the lack of a proper jail inspection, and that she needed to perform an investigation into the jail death, and how the death was not reported and/or reported properly. Mr. Portney told Dr. Doohan about continued ambulance ordinance violations and illegal activity occurring with the local fire department and the Local Emergency Services (EMS) Agency and how their actions went against the Health and Safety Code and the Lake County Ordinance. Mr. Portney told her that if she wanted goals and objectives, addressing these would be his recommendation for a good start. Mr. Portney told her that he had been trying to address these issues, but that he was ignored when he brought these problems to leadership's attention. As the Public Health Officer, Dr. Doohan was the designated authority to investigate jail deaths, as outlined in the Jail Medical contract with the County of Lake. Dr. Doohan said she was meeting with Ms. Parker that afternoon, and would talk with her about what they discussed about the jail death and needed investigation.

152.    On or about September 7, 2023, Mr. Portney and Dr. Doohan met again. Mr. Portney asked Kim Tengermann and Kelli Hanlon to join him in a meeting with Dr. Doohan yet again to discuss his concerns about the unreported overdose in the jail and the need for a jail inspection to be conducted by an official PHO (according to Sheriff Martin) because a proper jail inspection had not been done in more than 2 years(Health officers are

required to inspect jails in California at least once every two years (California Health and Safety Code § 1241). At this meeting, Mr. Portney provided Dr. Doohan with the necessary documents to conduct the jail inspection and inquired about investigating overdoses in the jail. Dr. Doohan spoke about preventative measures that the jail could take, such as during intake, the jail personnel could administer Narcan to inmates who are perceived to be high on drugs. Mr. Portney questioned the ethics and/or legality of that proposed implementation; Dr. Doohan said she would look into it.

153.    Mr. Portney believes the death was never reported by the Couty of Lake or the Lake County Sheriff's department, in violation of Assembly Bill 2761 and Penal Code 10008, which requires the County to report and post specific information within 10 days whenever a person dies in the County's custody, and the Death in Custody Reporting Act, which requires a local jail, local law enforcement, to report death information on a quarterly basis, and in violation of other laws. During Mr. Portney's employment, the County of Lake County had not reported an in custody death since April 15, 2023. (Currently, the last deaths that are reported for the County of Lake are April 15, 2023 and June 17, 2024).

**9/8/23 Request for FMLA/CFRA Leave & Parker's Deficiencies Letter**

154.    On September 8, 2023, Mr. Portney submitted his FMLA/CFRA baby bonding leave from October 23-November 6, 2023 via email to Ms. Samac and Ms. Rico.

155.     On September 8, 2023 at 2:52 p.m., Ms. Parker emailed Mr. Portney a pretextual "Notice of Performance Deficiencies Identified After Review of Goals and Objectives at an Ad Hoc Meeting on August 16, 2023." Ms. Parker informed Mr. Portney that she was going to share the Deficiencies Letter document with County Counsel and the Board of Supervisors. Ms. Parker requested Mr. Portney provide a response to her accusations the same day. Mr. Portney requested that his rebuttal and response be submitted and attached along with Ms. Parker's pretextual "Deficiencies" letter. However, months after his termination, Mr. Portney's rebuttal response was not included in his personnel file. Mr. Portney's rebuttal outlined that Ms. Parker's assessment was false and the objectives

were complete. Mr. Portney's rebuttal was sent to the Board, County Counsel, and Ms. Parker.

156. On September 11, 2023, Mr. Portney met with Dr. Doohan and informed her that it was Overdose Awareness Month and that it was on the Agenda tomorrow, that Mr. Portney's Department was presenting to the BOS a Proclamation Designating the thirty-first day of August as International Overdose Awareness Day. Mr. Portney then again expressed his concern to Dr. Doohan about the jail overdose death and that no investigation had been yet being conducted in the jail. Mr. Portney again asked Dr. Doohan to conduct a proper jail assessment and investigation. Dr. Doohan said she would need some time to review how to conduct a jail assessment and investigation. Dr. Doohan told Mr. Portney that she would be meeting with CAO Susan Parker in the early afternoon to discuss Mr. Portney's request for an investigation into the jail death amongst other topics. Mr. Portney asked Dr. Doohan if she would mind that he not be present for the meeting because he was whistleblowing about illegal activity and was already being targeted because he complained about harassment and asked for investigations.

Portney's 9/12/23 Termination

157. On Sept. 12, 2023, it was on the Board's agenda to Adopt Proclamation Designating the Thirty-First Day of August as International Overdose Awareness Day.  Mr. Portney went home sick around 2:00 p.m. He asked Ms. Hanlon to put him down for sick time. At 4:21 p.m., CAO Parker texted Mr. Portney, "The BOS has requested your presence in the Chambers. Please advise arrival."

158. Mr. Portney responded that he went home sick around 2:00 p.m., and had been working from home. He asked what this was regarding and wrote that he could Zoom in if that option was available. Ms. Parker did not respond.

159. After 5:00 p.m., the Board of Supervisors, after closed session terminated Portney after a motion and vote by the Board of Supervisors. At 5:37 p.m., County Counsel emailed Mr. Portney a Release Agreement. At the time of Mr. Portney's termination, he was

earning $12,608 per month and did not have health insurance through the County of Lake. Portney was effectively offered about $50,432.00 (4 months of salary) and had until September 18, 2023 to accept. Mr. Portney was terminated while some of his complaints were purportedly still under investigation with Ms. Petricca, and in retaliation for making his numerous complaints.

160.    On September 14, 2023, at 9:46 AM, Susan Parker emailed Mr. Portney a memorandum, an "Appendix A" the explanation was that Plaintiff's termination was "Management At-Will" ("For Cause" termination was not checked) and a form about unemployment as well as a General Release in exchange for about four months of pay.

161.    Weeks after Mr. Portney's termination, the County of Lake provided a purported "approved" Leave of Absence Request Form dated September 12, 2023, signed by CAO Susan Parker and Pam Samac for leave from October 23, 2023 to November 7, 2023 for baby bonding.

## FIRST CAUSE OF ACTION

### Race Discrimination in Violation of
### Title VII of the Civil Rights Act of 1964
### 42 U.S.C. § 2000e, *et. seq.*

162.    Mr. Portney incorporates by reference herein each and every paragraph of the complaint as though set forth fully herein.

163.    Defendant County was Plaintiff's employer for purposes of Title VII.

164. Workplace harassment constitutes a form of discrimination under Title VII.

165.    Title VII of the Civil Rights Act of 1964 prohibits employment discrimination on any of five specific grounds: race, color, religion, sex, [and] national origin. 42 U.S.C. §2000e-2(a)(1).

166.    Defendant County wrongfully terminated the employment of Mr. Portney, treating him differently in the termination process than any employee of a classification different from Mr. Portney. Defendant did not treated non-Black employees in such a disrespectful and malicious manner as Mr. Portney.

167.    Mr. Portney's race, Black/African American, was a substantial and motivating factor for Defendant's conduct in violation of Title VII.

168.    Mr. Portney has suffered the adverse employment actions as herein alleged. Mr. Porney's race, Black/African American, was a motivating factor for these adverse employment actions against him.

169.    Mr. Portney was harmed as herein alleged and Defendant County's adverse employment actions were a substantial factor in causing Mr. Portney's injuries, losses, damages and harm as herein alleged, which continue.

170.    As a legal result of the above described conduct of Defendant County, and each of them, Mr. Portney has sustained and will continue to sustain physical, mental, and emotional injuries, pain, distress, suffering, anguish, fright, nervousness, grief, anxiety, worry, shame, mortification, injured feelings, mental suffering, shock, humiliation, and indignity, as well as other unpleasant physical, mental, and emotional reactions, damages to his good name, reputation, standing in the community and other non-economic damages.

171.    As a further legal result of the above-described conduct of Defendant County and its employees and agents, and each of them, Mr. Portney was hindered, prevented and precluded from performing his usual activities, namely the full time position he had with Defendant County, causing Mr. Portney to sustain damages for loss of income, wages, earnings, and earning capacity, pension contributions and credit time for working, benefits, and other economic damages, in an amount to be ascertained according to proof. Mr. Portney claims such amounts as damages together with prejudgment interest. Mr. Portney's protected conduct was a substantial or motivating factor in any retaliatory acts taken by Defendant County.

172.    As a further legal result of the above-described conduct of Defendant County, and each of them, Mr. Portney suffered incidental, consequential and special damages in an amount according to proof.

173.    As a further legal result of the above-described conduct of Defendant County, and each of them, Mr. Portney has and will continue to incur attorney's fees and costs in an

1   amount according to proof.

2   174.   The conduct of Defendant County and its agents and employees as described

3   herein was malicious, oppressive, and done with a willful and conscious disregard for

4   Mr. Portney's rights. Defendant County and its agents and employees or supervisors

5   authorized, condoned and ratified the unlawful conduct of the others.

6   175.   Wherefore, Plaintiff prays for judgment as more fully set forth below.

### SECOND CAUSE OF ACTION
**Retaliation**
**Violation of Title VII of the Civil Rights Act of 1964**
**42 U.S.C. § 2000e,** *et. seq*.

10   176.   Mr. Portney incorporates by reference herein each and every paragraph of the

11   complaint as though set forth herein full.

12   177.   Title VII prohibits Defendants from retaliating against any employee because he

13   engaged in protected activity. Resisting and/or complaining of discrimination or harassment,

14   or retaliation are protected activities under Title VII.

15   178.   Defendant County and its agents, servants, and/or employees, engaged in

16   unlawful retaliation in violation of Title VII as described above.

17   179.   Mr. Portney repeatedly engaged in protected activities when he regularly opposed

18   discriminatory and harassing and retaliatory conduct in the workplace.

19   180.   Mr. Portney engaged in protected activities regularly, as he was constantly

20   opposing discriminatory and harassing conduct.

21   181.   As a result, Mr. Portney was viewed as a complainer and his complaints went

22   upon deaf ears.

23   182.   When Mr. Portney's complaints should have been investigated, he was further

24   retaliated for his complaints of race discrimination and harassment, which were all not

25   investigated or legitimately investigated, and terminated before conclusion of a supposed

26   investigation.

27   183.   Defendant County, its agents, and/or employees retaliated against Plaintiff on the

28   basis of his protected activities and took material and adverse employment actions against

Plaintiff. Mr. Portney's protected activities were a substantial or motivating factor in the retaliatory acts taken by Defendant County.

184.   As a direct and proximate result of Defendant's unlawful acts, Mr. Portney has suffered and continues to suffer injury including loss of wages, physical, mental and emotional injuries, pain, distress, suffering, anguish, fright, nervousness, grief, anxiety, worry, shame, mortification, injured feelings, mental suffering, shock, humiliation and indignity, as well as other physical, mental, and emotional reactions, damages to his good name, reputation, standing in the community and other non-economic damages, and he accordingly is entitled to an award of compensatory damages.

185.   As a further legal result of the above-described conduct of Defendant County and its agents, Mr. Portney has suffered incidental, consequential, and special damages in an amount according to proof.

186.   Plaintiff is entitled to statutory attorneys' fees and costs, and other appropriate relief as determined by this court.

187.   Wherefore, Mr. Portney prays for judgement as more fully set forth below.

## THIRD CAUSE OF ACTION

### Retaliation - Violation of Lab. Code § 1102.5

188.   Mr. Portney incorporates by reference as though fully set forth herein, each and every allegation set forth above in this Complaint.  As a separate and distinct claim for relief, Mr. Portney alleges as follows:

189.   Cal. Lab. Code § 1102.5 provides,

(a) An employer, or any person acting on behalf of the employer, shall not make, adopt, or enforce any rule, regulation, or policy preventing an employee from disclosing information to a government or law enforcement agency, to a person with authority over the employee, or to another employee who has authority to investigate, discover, or correct the violation or noncompliance, or from providing information to, or testifying before, any public body conducting an investigation, hearing, or inquiry, if the employee has reasonable cause to believe that the information discloses a violation of state or federal statute, or a violation of or noncompliance with a local, state, or federal rule or regulation, regardless of whether disclosing the information is part of the employee's job duties.

(b) An employer, or any person acting on behalf of the employer, shall not retaliate against an employee for disclosing information, or because the employer believes that the employee disclosed or may disclose information, to a government or law enforcement agency, to a person with authority over the employee or another employee who has the authority to investigate, discover, or correct the violation or noncompliance, or for providing information to, or testifying before, any public body conducting an investigation, hearing, or inquiry, if the employee has reasonable cause to believe that the information discloses a violation of state or federal statute, or a violation of or noncompliance with a local, state, or federal rule or regulation, regardless of whether disclosing the information is part of the employee's job duties.

( c) An employer, or any person acting on behalf of the employer, shall not retaliate against an employee for refusing to participate in an activity that would result in a violation of state or federal statute, or a violation of or noncompliance with a local, state, or federal rule or regulation.

190.    In addition, a report made by an employee of a government agency to their employer is a disclosure of information to a government or law enforcement agency pursuant to subdivisions (a) and (b). Cal. Lab. Code § 1102.5 (e).

191.    Defendant County retaliated against Mr. Portney because he reported and opposed racial discrimination and harassment, retaliation, harassment of others, and because Mr. Portney also reported what he believed to be violations of non-compliance with ordinances, local, state, or federal rules or regulations, including numerous health and safety violations, Brown Act violations, violations of the RFP in public contracts, violation of Cal. Penal Code 10008, Cal. Health & Safety Code 1241, in addition to numerous others.

192.    As a direct and proximate result of Defendant's unlawful acts, Mr. Portney has suffered and continues to suffer injury including loss of wages, physical, mental and emotional injuries, pain, distress, suffering, anguish, fright, nervousness, grief, anxiety, worry, shame, mortification, injured feelings, mental suffering, shock, humiliation and indignity, as well as other physical, mental, and emotional reactions, damages to his good name, reputation, standing in the community and other non-economic damages, and he accordingly is entitled to an award of compensatory damages.

193.    As a further legal result of the above-described conduct of Defendant, Plaintiff was hindered, prevented, and precluded from performing usual work activities, causing Plaintiff to sustain damages for loss of professional opportunities, work experience, and/or employment

opportunities and advancement in an amount according to proof at trial.

194.    As a further legal result of the above-described conduct of Defendant County and its agents, Mr. Portney has suffered incidental, consequential, and special damages in an amount according to proof.

195.    The conduct of Defendant County and its agents and employees as described herein was malicious, oppressive, and done with a willful and conscious disregard Mr. Portney's rights and for the deleterious consequences of Defendant County's actions. Defendant and their agents and employees authorized, condoned, and ratified the unlawful conduct of the other.

196.    As a direct and proximate result of the aforesaid unlawful acts of Defendant County, Mr. Portney has suffered wage loss and mental suffering.

197.    Plaintiff is entitled to statutory attorneys' fees and costs, and other appropriate relief as determined by this court.

198.    Wherefore, Plaintiff prays judgement as more fully set forth below.

## FOURTH CAUSE OF ACTION

### Retaliation for Exercising First Amendment Right to Free Speech, 42 U.S.C. §1983

199.    Mr. Portney incorporates by reference herein each preceding paragraph of the complaint as though set forth herein full.

200.    Mr. Portney brings this claim under federal statute 42 U.S.C. §1983, which provides that any person or persons, who, under color of law, deprives another of any rights, privileges, or immunities secured by the Constitution or laws of the United States shall be liable to the injured party.

201.    Public employees enjoy the right to free speech with respect to matters of public concern, and the right not to suffer retaliation on account of that speech, as protected by the First and Fourteenth Amendments to the U.S. Constitution. State action designed to retaliate against, and chill free speech strikes at the very heart of the First Amendment.

202. Mr. Portney exercised his First and Fourteenth Amendment rights to free speech when he voiced his concerns about racial sex/gender discrimination, about the pervasively hostile work environment, and about conduct that he believed were violations of law, and he did so repeatedly, as alleged above. These expressions were matters of public concern protected by the First Amendment, and not pursuant to his "official duties."

203. In response to Mr. Portney's protected speech, Defendant County acting under color of law engaged in various adverse employment actions against Mr. Portney including but not limited to retaliation, not protecting him, have a fake investigation(s), lack of normal reporting procedures, harassment, discrimination, shunning Mr. Portney, preventing him from doing his job, stonewalling, termination, to name some. These adverse employment actions were such that a reasonable employee would have found them to be materially adverse and would have dissuaded a reasonable employee of Defendant County from engaging in this protected speech activity, thus, chilling the exercise of his speech.

204. Plaintiff's speech was a substantial or motivating factor for the adverse employment actions taken against him by Defendant.

205. Defendant's actions have caused and continue to cause Plaintiff substantial loss of reputation and professional injury, loss of promotional opportunities, attorney fees, humiliation, embarrassment, and anguish, all to his damage in an amount according to proof.

206. Wherefore, Plaintiff prays judgement as more fully set forth below.

**FIFTH CAUSE OF ACTION**
**Retaliation – Monell Action –**
**Retaliation for Exercising Free Speech**
**Based on Policy and/or Failure to Train or Supervise**
**in Violation of 42 U.S.C. §1983**

207. Mr. Portney incorporates by reference herein each and every paragraph of the complaint as though set forth herein in full.

208. Defendant County acted under color of law to deprive Plaintiff of his rights to Freedom of Speech under the First and Fourteenth Amendments to the U.S. Constitution.

209. On information and belief, the County's practice of retaliation, harassment and

abuse carried out against Mr. Portney, although not authorized by any written law or express policy, is so permanent, well-settled and well-known by longtime County employees as to constitute a custom and practice with the force of law.

210.    Defendant County employees repeatedly engaged in racist and harassing conduct, they failed and refused to comply with County policies to address, prevent, discipline, and remedy such harassment.

211.    That the County practice of tolerating discrimination, harassment and retaliation was so permanent and well-settled as to constitute a custom and practice with the force of law is evident, not only from Plaintiff Portney's allegations above, but also by the County's termination of HR Director, Pamela Nichols, who is Black/African-American, and former DA Daniel Flesch, who is Jewish.

212.    Defendant County's wrongful termination of Ms. Nichols demonstrated that its tradition of failing and refusing to enforce its own written policies against harassment had taken on the force of law as the County's permanent, well-settled custom and practice. Nichols' Federal Court complaint, alleging multiple civil rights violations, is case number 20-cv-05259, filed in the Northern District of California on July 31, 2020. Mr. Flesch's Federal Court complaint, alleging multiple civil rights violations, is case number 3:21-cv-02018 SI, filed March 23, 2021.

213.    Defendant County was not only deliberately indifferent to the constitutional rights of its employees, including but not limited to Plaintiff Portney, but demonstrated a conscious disregard for the constitutional rights of its employees.

214.    As a legal result of the above described conduct of Defendant County, and each of them, Mr. Portney has sustained and will continue to sustain physical, mental, and emotional injuries, pain, distress, suffering, anguish, fright, nervousness, grief, anxiety, worry, shame, mortification, injured feelings, mental suffering, shock, humiliation, and indignity, as well as other physical, mental, and emotional reactions, damages to his good name, reputation, standing in the community and other non-economic damages. Mr. Portney's protected conduct

was a substantial or motivating factor in any retaliatory acts taken by Defendant County.

215.   As a further legal result of the above-described conduct of Defendant County, and each of them, Mr. Portney was hindered, prevented, and precluded from performing usual work activities, causing Mr. Portney to sustain damages for the loss of earning capacity and work advancement and/or promotion.

216.   As a further legal result of the above-described conduct of Defendant County, Mr. Portney suffered incidental, consequential and special damages in an amount according to proof.

217.   As a further legal result of the above-described conduct of Defendant Portney, and each of them, Mr. Porntney has and will continue to incur attorney's fees and costs in an amount according to proof.

218.   As a direct and proximate result of the aforesaid unlawful acts of Defendant County, and each of them, Mr. Portney has suffered mental health consequences in an amount to be proven at time of trial.

219.   Wherefore, Plaintiff prays for judgement as more fully set forth below.

## SIXTH CAUSE OF ACTION

### Race Discrimination in Violation of FEHA

### Government Code §12940, et. seq.

220.   Mr.Portney incorporates by reference all of the factual allegations set forth in this complaint except those inconsistent with this cause of action.

221.   At all times herein mentioned, the Fair Employment and Housing Act, California Government Code §12900-12996 (hereinafter "FEHA"), was in full force and effect and binding on Defendant County. These statutes required Defendant County to refrain from discriminating against any employee on the basis of race, national origin, gender and engaging in protected activity.

222.   The FEHA makes it an unlawful employment practice for an employer to discriminate against an employee in "terms, conditions, or privileges of employment" on the

basis of the employee's race, national origin, gender and engaging in protected activity.

223.    Defendant County was an employer for purposes of the Fair Employment and Housing Act, California Government Code §12900-12996 (hereinafter "FEHA").

224.    DEFENDANTS discriminated against Mr. Portney on the basis of his race, Mr. Portney's race, Black/African American, was a motivating factor in Defendant County's decision to terminate him. Mr. Portney was treated differently than other similarly situated employees because of his race.

225.    Defendant County subjected Plaintiff to severe and pervasive harassment and discrimination based on his race, which created a hostile work environment.

226.    As a legal result of the above described conduct of Defendant and their agents, and each of them, Mr. Portney has sustained wage loss and will continue to sustain physical, mental, and emotional injuries, pain distress, suffering, anguish, fright, nervousness, grief, anxiety, worry, shame, mortification, injured feelings, mental suffering, shock, humiliation, and indignity, as well as other physical, mental, and reactions, damages to his good name, reputation, standing in the community and other non-economic damages.

227.    As a further legal result of the above-described conduct of Defendant County, and each of them, Mr. Portney suffered incidental, consequential and special damages in an amount according to proof.

228.    As a further legal result of the above-described conduct of Defendant County, and each of them, Mr. Portney has and will continue to incur attorney's fees and costs in an amount according to proof.

229.    As a direct and proximate result of the aforesaid unlawful acts of Defendant, and each of them, Mr. Portney has suffered mental health. Mr. Portney claims damages for such health problems in an amount to be proven at time of trial.

230.    By reason of the conduct of Defendants herein, Mr. Portey has retained attorneys to prosecute his claims under FEHA. Plaintiff is therefore entitled to recover reasonable attorney's fees and costs pursuant to Government Code §12940 *et seq.*, in addition to other

damages as provided by law as alleged herein.

## SEVENTH CAUSE OF ACTION

### Retaliation in Violation of FEHA

### Government Code § 12940(h)

231.    Plaintiff realleges and incorporates by reference the foregoing, as though fully set forth herein.

232.    At all relevant times, the Fair Employment and Housing Act and its implementing regulations, including California Government Code §12900-12996 (hereinafter "FEHA"), were in full force and effect. Defendant County, through itself and its agents, was an employer for the purposes of FEHA. These statutes required Defendants to refrain from discriminating against any employee on the basis of race, gender, national origin, religion and/or religious creed and engaging in protected activity.

233.    California Government Code §12940(h) states:

It is an unlawful employment practice, unless based upon a bona fide occupational qualification, or, except where based upon applicable security regulations established by the United States or the State of California…for any employer, labor organization, employment agency, or person to discharge, expel, or otherwise discriminate against any person because the person has opposed any practices forbidden under this part or because the person has filed a complaint, testified, or assisted in any proceeding under this part.

234.    Defendant County retaliated against Mr. Portney as he opposed and reported discrimination, including racial, sex and religious discrimination, by Defendants in the workplace against himself and other coworkers. No effective action was taken by Defendant County. Defendant County's retaliation against Mr. Portney violated FEHA.

235.    FEHA makes it an unlawful employment practice for an employer to discriminate against an employee in "terms, conditions, or privileges of employment" on the basis of the employee's religion/religious creed, race, national origin, gender, and engaging in protected activity.

236.    FEHA further provides in Government Code §12940(h) that it is unlawful for

an employer to discharge or otherwise discriminate against a person "because the person has opposed any practices forbidden under FEHA." The California Supreme Court has instructed that Government Code §12940(h) therefore "forbids employers from retaliating against employees who have acted to protect the rights afforded by the FEHA." *Yanowitz v. L'Oreal USA, Inc.* (2005) 36 Cal. 4th 1028, 1035.

237.    Plaintiff's reporting of allegations of discrimination, including racial, sex and religious discrimination, harassment, and inequality, in the workplace was a substantial motivating reason for Defendant County's retaliation and adverse actions against Ms. Portney.

238.    As a legal and proximate result of Defendant County's actions and those of its agents, Mr. Portney was harmed. Defendant County's conduct as herein alleged was a substantial factor in causing Mr. Portney's harm.

239.    As a legal result of the above described conduct of Defendant County, and each of them, Mr. Portney has sustained and will continue to sustain wage loss, physical, mental, and emotional injuries, pain distress, suffering, anguish, fright, nervousness, grief, anxiety, worry, shame, mortification, injured feelings, mental suffering, shock, humiliation, and indignity, as well as other physical, mental, and emotional reactions, damages to his good name, reputation, standing in the community and other non-economic damages.

240.    As a further legal result of the above-described conduct of Defendants, and each of them, Mr. Portney was required, and in the future may be required, to engage the services of health care providers, and incurred expenses for medicines and other related expenses in a sum to be ascertained according to proof.

241.    As a direct and proximate result of Defendants unlawful actions as described above, Mr. Portney has incurred, and will continue to incur loss of employment opportunities, advancement, and promotional opportunities, all due to this damage in an amount according to proof.

242.    As a further legal result of the above-described conduct of Defendant County, and each of them, Mr. Portney suffered incidental, consequential, and special damages in an

amount according to proof.

243.    As a further legal result of the above-described conduct of Defendant County, and each of them, Mr. Portney has and will continue to incur attorney's fees and costs in an amount according to proof.

244.    The conduct of Defendant County and/or their agents and/or employees as described herein was malicious, oppressive, and done with a willful and conscious disregard for Mr. Portney's rights and for the deleterious consequences of Defendant's actions.

245.    Finally, as a direct and proximate result of the aforesaid unlawful acts of Defendants, and each of them, Mr. Portney has suffered mental health damages. Mr. Portney claims damages for such health problems in an amount to be proven at time of trial.

246.    By reason of the conduct of Defendants herein, Mr. Portney has retained attorneys to prosecute his claims under FEHA. Mr. Portney is therefore entitled to recover reasonable attorney's fees and costs pursuant to Government Code §12940 et seq., in addition to other damages as provided by law as alleged herein.

247.    Wherefore, Plaintiff prays for judgement as more fully set forth below.

## **EIGHTH CAUSE OF ACTION**

### **Race Harassment in Violation of FEHA**

### **Cal. Gov. Code §12940(a)**

248.    Plaintiff realleges and incorporates by reference the foregoing, as though fully set forth herein.

249.    At all times material to this complaint, Plaintiff was an employee within the meaning of the FEHA.

250.    Defendant County is an employer within the meaning of the FEHA.

251.    California Government Code §§ 12940, et seq. prohibits an employer from discriminating against and harassing an employee on the basis of his religion.

252.    The above-described actions and omissions of Defendant County constituted harassment of Plaintiff on account of his race.

253. Plaintiff was subjected to working in a severe, persistent, or pervasively hostile work environment, which interfered with his work performance, denied him employment privileges, and adversely affected the terms and conditions of his job based on his race/Black/African-American.

254. The harassing conduct to which Plaintiff was subjected was so severe, widespread, or persistent that a reasonable person in Plaintiff's circumstances would have considered the work environment to be hostile or abusive.

255. Plaintiff considered the work environment to be hostile or abusive.

256. The conduct of Defendant County constitutes a continuing violation of Plaintiff's rights from the first act to the latest action.

257. As a direct, foreseeable, and proximate result of Defendant's actions, Plaintiff has suffered and continues to suffer humiliation, embarrassment, mental and emotional distress, and discomfort, all to Plaintiff's damage in an amount in excess of the minimum jurisdiction of this court, the precise amount to be proven at trial.

258. As a direct and proximate result of the discrimination and harassment suffered by Plaintiff and the hostile and offensive work environment as described above, Plaintiff has incurred, and will continue to incur, expenses, wages, opportunities for employment and advancement, and work experience, all to his damage in an amount according to proof.

259. As a further direct and proximate result of Defendant County's violation of the FEHA, Plaintiff has been compelled to retain the services of counsel in an effort to enforce his statutory rights and the terms and conditions of his employment relationship with Defendant County, and have thereby incurred, and will continue to incur, legal fees and costs, the full nature and extent of which are presently unknown to Plaintiff, and Plaintiff is therefore entitled to reasonable attorneys' fees and costs of suit as provided by the FEHA, Cal. Govt. Code § 12965(b).

WHEREFORE, Plaintiff prays for judgment against Defendant County as set forth below.

**NINTH CAUSE OF ACTION**

**Failure to Prevent Discrimination, Harassment, and Retaliation**

**FEHA, California Govt. Code § 12940(k)**

260.    Plaintiff incorporates by reference herein each and every paragraph of the complaint as though set forth herein full.

261.    Pursuant to California Government Code §12940(k), it is an unlawful employment practice for an employer to fail to take all reasonable steps to prevent harassment from occurring.

262.    On information and belief, Defendant County did not take all reasonable steps to prevent discrimination and harassment from occurring. On information and belief, at all relevant times, Defendant did not have appropriate policies, procedures, practices, guidelines, rules, trainings and/or enforcement regarding the prevention of harassment and discrimination in the workplace. Defendants' conduct as alleged herein constitutes a violation of §12940(k).

263.    As a legal result of the above-described conduct of Defendants, and each of them, Plaintiff has sustained and will continue to sustain physical, mental, and emotional injuries, pain distress, suffering, anguish, fright, nervousness, grief, anxiety, worry, shame, mortification, injured feelings, mental suffering, shock, humiliation, and indignity, as well as other physical, mental, and emotional reactions, damages to his good name, reputation, standing in the community and other non-economic damages.

264.    As a further legal result of the above-described conduct of Defendants, and each of them, Plaintiff was required, and in the future may be required, to engage the services of health care providers, and incurred expenses for medicines and other related expenses in a sum to be ascertained according to proof.

265.    As a further legal result of the above-described conduct of Defendants, and each of them, Mr. Portney suffered incidental, consequential and special damages in an amount according to proof.

1

2    266.    As a further legal result of the above-described conduct of Defendants, and

3    each of them, Mr. Portney has and will continue to incur attorney's fees and costs in an

    amount according to proof.

4    267.    Finally, as a direct and proximate result of the aforesaid unlawful acts of

5    Defendants, and each of them, Plaintiff has suffered stress-related health consequences. Mr.

6    Portney's claims damages for such health problems in an amount to be proven at time of

7    trial.

8    268.    By reason of the conduct of Defendants herein, Mr. Portney has retained

9    attorneys to prosecute his claims under FEHA. Plaintiff is therefore entitled to recover

10   reasonable attorney's fees and costs pursuant to Government Code §12940 et seq., in

11   addition to other damages as provided by law as alleged herein.

12   269.    Wherefore, Plaintiff prays for judgement as more fully set forth below.

13                              **TENTH CAUSE OF ACTION**

14   **Retaliation for Taking & Requesting California Family Rights Act Leave**

15   **"CFRA"- California Govt. Code § 12945.2(k)**

16

17   270.    Plaintiff incorporates by reference as though fully set forth herein, each and

18   every allegation set forth above in this Complaint.

19   271.    At all times relevant herein, Plaintiff worked for Defendant County for over

20   12 months, had worked at least 1,250 hours during the 12 months period immediately

21   preceding the first day of leave and Defendant County employed more than 50 employees.

22   272.    In early November 2022, Mr. Portney's son was born.

23   273.    In January 2023, Mr. Portney started taking intermittent protected CFRA leave

24   for baby bonding.

25   274.    Mr. Portney was approved to take CFRA leave for baby bonding for the entire

26   month of June 2023.

27   275.    On September 8, 2023, Mr. Portney again requested taking CFRA leave for

28   baby bonding, from October 23-November 6, 2023. Plaintiff was eligible for the requested

leave.

276.    On September 8, 2023, after Mr. Portney submitted his FMLA/CFRA leave request, Ms. Parker emailed Mr. Portney a pretextual, "Deficiencies Letter." Ms. Parker informed Mr. Portney that she was going to share the Deficiencies Letter with County Counsel and the Board of Supervisors.

277.    On September 12, 2023, Mr. Portney was informed that the BOS terminated his employment. In response to a request for Mr. Portney's personnel file, several weeks after Mr. Portney's termination, the County of Lake provided Mr. Portney's attorney with a Leave of Absence Request Form, that was dated September 12, 2023, and signed by CAO Susan Parker and Pam Samac, for purported approved leave for Mr. Portney, from October 23, 2023 to November 7, 2023. Mr. Portney was not provided this supposed approval for leave during his employment.

278.    Mr. Portney was never paid for his work in January 2023, during his CFRA leave for baby bonding. It was unlawful for Defendant to have Mr. Portney work during his protected CFRA leave, and to not compensate Mr. Portney for his work.

279.    It was unlawful for Defendant to discharge, retaliate against Plaintiff because of Plaintiff's exercise of the right to take leave for baby bonding pursuant to Cal. Govt. Code § 12945.2.

280.    As a direct, foreseeable and legal result of Defendants' discriminatory acts, Plaintiff has suffered and continue to suffer substantial losses in earnings, bonuses and other employment benefits, in addition to expenses incurred in obtaining alternative employment, and have suffered and continue to suffer humiliation, embarrassment, mental and emotional distress, and discomfort, all to Plaintiff's damage in an amount to be proven at trial.

281.    By reason of the conduct of Defendant, Plaintiff has necessarily retained attorneys to prosecute this action.  Plaintiff is therefore entitled to reasonable attorney's fees and litigation expenses incurred in bringing this lawsuit.

282.    Wherefore, Plaintiff prays for judgement as more fully set forth below.

**ELEVENTH CAUSE OF ACTION**

**Wrongful Termination in Violation of 14th Amendment Right to Due Process -**
**Monnell Action, 42 USC 1983, Based on Official Policy, Practice or**
**Custom in Violation of 42 U.S.C.**

283.    Plaintiff incorporates by reference as though fully set forth herein, each and every allegation set forth above in this Complaint.

284.    Mr. Portney brings this claim under federal statute 42 U.S.C. §1983, which provides that any person or persons, who, under color of law, deprives another of any rights, privileges, or immunities secured by the Constitution or laws of the United States shall be liable to the injured party.

285.    The United States Constitution provides: "nor shall any State deprive any person of life, liberty, or property without due process of law." The Right to Due Process includes a right to notice and a fair hearing.

286.    Mr. Portney engaged in the protected activities as described above. Mr. Portney was summarily terminated and not provided with all of his Constitutional Rights to Due Process.

287.    Defendant acted under color of law at all times herein relevant. The acts of Defendant County deprived Mr. Portney of his particular rights under the laws of the United States and the United States Constitution as herein set forth, and under the Fourteenth Amendment Right to Due Process.

288.    Defendant County acted pursuant to an expressly adopted official policy or a longstanding practice or custom of Defendant County.

289.    Defendant wrongfully and retaliatorily terminated the employment of Mr. Portney in violation of public policy which provides for Due Process, to maintain his property right in his employment with Defendant County, and to be free from retaliation in the workplace. Defendant terminated his employment as a result of illegally intruding on her Fourteenth Amendment Right to Due Process as herein alleged, which was a motivating

factor in his termination and Mr. Portney was treated differently than other similarly situated County employees.

290.    As a direct, foreseeable and legal result of Defendant's discriminatory acts, Plaintiff has suffered and continue to suffer substantial losses in earnings, bonuses and other employment benefits, in addition to expenses incurred in obtaining alternative employment, and have suffered and continue to suffer humiliation, embarrassment, mental and emotional distress, and discomfort, all to Plaintiff's damage in an amount to be proven at trial.

291.    By reason of the conduct of Defendant,, Plaintiff has necessarily retained attorneys to prosecute this action.  Plaintiff is therefore entitled to reasonable attorney's fees and litigation expenses incurred in bringing this lawsuit.

292.    Wherefore, Plaintiff prays for judgement as more fully set forth below.

## TWELFTH CAUSE OF ACTION

**Wrongful Termination in Violation of 14th Amendment Right to Property & Equal Protection- Monnell Action, 42 USC 1983, Based on Official Policy, Practice or Custom in Violation of 42 U.S.C. § 1983**

293.    Plaintiff incorporates by reference herein each and every paragraph of the complaint as though set forth herein full.

294.    The Fourteenth Amendment of the United States Constitution provides, in pertinent part, that…"no state shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any state deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws."

295.    Mr. Portney brings this claim under federal statute 42 U.S.C. §1983, which provides that any person or persons, who, under color of law, deprives another of any rights, privileges, or immunities secured by the Constitution or laws of the United States shall be liable to the injured party.

296.    Mr. Portney engaged in the protected activities described above and

incorporated herein.

297. Defendant County, acting in its official capacity acted under color of law at all times herein relevant.

298.   The acts of Defendant County deprived Mr. Portney of his rights under the laws of the United States and the United States Constitution as herein set forth, and under the Fourteenth Amendment Right to Property and Equal Protection. Plaintiff was treated discriminatorily, and disparately from the way in which Defendant treated individuals of a different classification from Mr. Portney, denying him equal protection under the law.

299.   Defendant County acted pursuant to an expressly adopted official policy or a longstanding practice or custom of Defendant County.

300.   The Defendant's acts, as herein alleged, were so closely related to the deprivation of Mr. Portney's rights as to be the cause that caused Mr. Portney's ultimate injuries as herein alleged.

301.   Defendant wrongfully and retaliatorily terminated the employment of Mr. Portney in violation of public policy which provides for Due Process, to maintain his property right in his employment with Defendant County, and to be free from retaliation in the workplace. Defendant terminated his employment as a result of illegally intruding on his Fourteenth Amendment Right to Due Process as herein alleged, which was a motivating factor in his termination and Mr. Portney was treated differently than other similarly situated County employees.

302.   As a direct, foreseeable and legal result of Defendant's discriminatory acts, Plaintiff has suffered and continue to suffer substantial losses in earnings, bonuses and other employment benefits, in addition to expenses incurred in obtaining alternative employment, and have suffered and continue to suffer humiliation, embarrassment, mental and emotional distress, and discomfort, all to Plaintiff's damage in an amount to be proven at trial.

303.     By reason of the conduct of Defendant, Plaintiff has necessarily retained

attorneys to prosecute this action.  Plaintiff is therefore entitled to reasonable attorney's fees and litigation expenses incurred in bringing this lawsuit.

304.    Wherefore, Plaintiff prays for judgement as more fully set forth below.

WHEREFORE, Plaintiff prays for the following relief against Defendant and each of them:

1.    For general damages in the amount of $20,000,000 according to proof;

2.    For special damages according to proof;

3.    For all statutory attorney fees and costs;

4.    For pre-judgement and post-judgement interest at the maximum legal rate on all sums awarded;

5.    For such other relief as the Court deems just and proper.

6.    Plaintiff hereby demands a trial by jury.

Dated: January 15, 2025                     *Candice Clipner*

By:_____
        Candice Clipner
        Attorney for Plaintiff,
        JONATHAN PORTNEY